**T. ROWE PRICE RECOVERY FUND, L.P., Carl Marks Management Co., L.P., Carl Marks Strategic Investments, L.P. and Carl Marks Strategic Investments II, L.P., individually and derivatively on behalf of Seaman Furniture Co., Inc., Plaintiffs,**

v.

**James RUBIN, M.D. Sass Associates, Inc., Resurgence Asset Management, L.L.C., M.D. Sass Corporate Resurgence Partners, L.P., M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, Byron Haney, Alan Rosenberg, Steven H. Halper, and Peter McGeough, Defendants,**

and

**Seaman Furniture Co., Inc., Nominal Defendant.**

C.A.No. 18013.

Court of Chancery of Delaware, New Castle County.

Submitted: June 19, 2000.
Decided: June 23, 2000.

Martin P. Tully, Esquire and David John Teklits, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Martin Flumenbaum, Esquire, Danya E. Perry, Esquire Joshua Groban, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Plaintiffs.

Daniel A. Dreisbach, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Andrew J. Frackman, Tancred Schiavoni, Esquire, and Rob Stern, Esquire, of O'Melveny & Myers LLP, New York, New York, Attorneys for Defendants James Rubin, M.D. Sass Associates, Inc., Resurgence Asset Management LLC, Sass Corporate Resurgence Partners LP, M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, and Byron Haney.

William D. Johnston, Esquire, and John J. Paschetto, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Stefanie Gatti, Esquire, of Epstein Becker & Green, New York, New York, Attorneys for Defendants Rosenberg, Halper and McGeough.

Stephen C. Norman, Esquire, of Potter, Anderson & Corroon, Wilmington, Delaware; John M. Newman, Jr., Esquire, and Sean P. Costello, Esquire, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, Attorneys for Nominal Defendant Seaman Furniture Company, Inc.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

On April 26, 2000, two investment funds collectively holding 42% of the stock of Seaman Furniture Company, Inc. filed this individual and derivative action against Seaman, Resurgence Asset Management, L.L.C. (Seaman's majority stockholder), Resurgence's board designees, and the company's executive management. The funds seek to enjoin the implementation of management and shared services agreements (the "Agreements" or "Challenged Transactions") recently executed between Seaman and its chief competitor, Levitz Furniture, Inc., which has been in bankruptcy since 1997. The Agreements are an integral part of Levitz's plan to emerge from bankruptcy.

Resurgence is both the majority stockholder of Seaman and the controlling person of Levitz, due to its substantial holdings of Levitz's pre-petition and post-petition claims. Thus, the Agreements, contemplating a long-term business relationship between Seaman and Levitz, are interested-party transactions.

Plaintiffs originally sought an expedited trial in this matter. They later moved for a preliminary injunction when defendants insisted that the matter be heard more quickly to accommodate Levitz's need to present its plan of reorganization to the Bankruptcy Court. After thorough and exceptional briefing by each of the parties, I heard oral argument on June 19, 2000. This is my Opinion granting plaintiffs' motion.

## II. FACTUAL BACKGROUND[1]

### A. The Parties

Plaintiffs T. Rowe Price Recovery Fund, L.P. ("Price") and Carl Marks Management Co., L.P. ("Marks")[2] collectively own 42% of the common stock of Seaman on a fully diluted basis. Defendants Resurgence, M.D. Sass Associates, Inc. and M.D. Sass Corporate Resurgence International, Ltd. (collectively, "Resurgence") own approximately 55% of Seaman's common stock. Defendant James Rubin is a principal, and the co-chairman and chief investment officer, of Resurgence. Rubin and defendants Robert Symington and Byron Haney are Resurgence's designees to the Seaman board of directors.

Seaman is a furniture retailer with stores mainly in the northeastern United States. In January 1992, Seaman filed for protection under Chapter 11 of the United States Bankruptcy Code and emerged therefrom in October 1992. Plaintiffs and Resurgence, Seaman's largest creditors at that point, became its largest stockholders. The Seaman board of directors was then Robert Ruocco (Marks's designee), Kim Golden (Price's designee) Kay Handley (Resurgence's designee, later replaced by Rubin himself) defendant Alan Rosenberg

1. I rely principally on the uncontested facts in this matter. I have also, as is often necessary on a motion of this nature, made preliminary findings of fact on certain matters that may be contested by the parties. Should this matter ultimately go to trial, the parties will naturally have an opportunity to further develop the already voluminous record of this case in an effort to prove additional and, if the evidence so justifies, different factual findings.

2. Marks is actually the general partner of other funds who hold the Seaman stock. Those entities were made plaintiffs in this action by an amended complaint dated June 19, 2000. For ease of reference in this Opinion, I consider each of the Marks entities as a unit.

and independent directors Leo Peraldo and Barry Alperin.[3]

Defendants Rosenberg, as chief executive officer (and a director), Steven Halper, as chief operating officer, and Peter McGeough, as chief financial officer (collectively, "Management"), have constituted the executive management of Seaman since its successful emergence from bankruptcy. All parties ascribe to them much credit for their skill and effort in making Seaman a successful company in an industry that has seen numerous failures.[4]

In December 1997, the principals took the company private, resulting in an ownership breakdown in which plaintiffs owned 42%, Resurgence owned 38% and Management owned 18% of the company's equity.[5] As part of that transaction, the parties considered entering a shareholders agreement, but plaintiffs rejected that idea.[6] Since 1997, Seaman has continued to provide value to its stockholders, who have at times considered different transactions intended either to maximize value through continued growth or by providing an exit strategy for the investors.

## B. Resurgence's Investment in Levitz

Levitz, a national chain of furniture stores, is Seaman's principal competitor. According to defendants, about half of Levitz's 20 stores along the eastern seaboard compete directly with Seaman stores. Levitz filed for Chapter 11 protection in September 1997. As Levitz's largest pre-petition creditor and the provider of a substantial part of its post-petition debtor-in-possession financing, Resurgence controls Levitz. While Resurgence has not provided a definitive number, it is understood that Resurgence's investment in Levitz is in the $80–125 million range.

Plaintiffs assert that "Levitz is in abysmal financial straits."[7] While defendants astutely point out that in 1992, Seaman was in a similar position and still recovered impressively, Resurgence will face significant losses if Levitz fails. Plaintiffs point out that "Levitz's Disclosure Statement requires it to project what would happen if it were required to liquidate. In the Statement, Levitz reveals that, upon liquidation of Levitz, Resurgence would lose 100% of its pre-petition claims and 54% of its post-petition claims."[8] Defendants answer, however, that Levitz will not necessarily go into liquidation without Seaman's involvement and may emerge from bankruptcy on its own or with the help of some other entity.

---

**3.** Neither Peraldo nor Alperin were named as defendants in this action. Both were deposed and Alperin, but not Peraldo, submitted an affidavit on behalf of defendants.

**4.** Management correctly point to numerous references in the record to their value and skill. For example, Ruocco testified that "I know what they do is special and unique ..." Ruocco Dep. at 51. Further, "whatever it is they do is unique because they produce unique financial results. And there are countless other furniture retailers, Levitz included, who have not been able to do what Seaman does...." *Id.* at 57–58.

**5.** Although the record is unclear on this point, I assume, based on evidence of their recent stock sales, that the tier of managers immediately below Management (hereinafter "Senior Management") held the remaining Seaman shares.

**6.** While plaintiffs assert that they rejected the idea because, to that point, the relationship had worked out so well that a formal agreement seemed unnecessary, defendants observe that at that time, when plaintiffs held the largest block of Seaman stock, such an agreement may not have served plaintiffs' interests.

**7.** Pl. Op. Br. at 9.

**8.** *Id.* at 11.

## C. Resurgence Purchases Voting Control of Seaman

Each of Seaman's principal investors has sought to pursue a transaction that could maximize shareholder value. In that regard, plaintiffs retained the advice of independent financial advisors with respect to potential acquisitions, mergers, sales of assets, an IPO, a recapitalization and so on.[9] At various times, Seaman also hired its own advisors to conduct such analyses. The advisors ruled out certain courses, such as an IPO, but thought others, such as strategic acquisitions or perhaps a sale of control to an interested buyer, to be feasible.

In May 1998, Rubin suggested a possible acquisition of Levitz. The board voted to consider that prospect and authorized Rosenberg to contact the CEO of Levitz to discuss the same. In October 1998, Ruocco and Golden met with McGeough, who reported that Levitz was not an attractive investment for Seaman.

Rubin, however, continued to suggest Levitz as a potential merger partner. Near the end of 1998, Rubin advised Management about a possible interest in purchasing some or all of their Seaman shares, and noted that their compensation would naturally increase if they were responsible for a combined Seaman–Levitz

entity. At about this same time, plaintiffs also approached Management with respect to a possible stock sale or purchase.

In early-Spring 1999, Seaman hired the accounting firm of Policano and Manzo ("P & M") to evaluate again a transaction with Levitz. P & M reported quite negatively, and the board again determined that no transaction was feasible. Price and Marks adamantly insisted that a deal with Levitz would not benefit Seaman.[10]

Rubin and Management signed agreements on June 22, 1999, resulting in Management's exercise of options to purchase 121, 717 shares (slightly more than 12%) of Seaman and immediate sale of those shares to Resurgence for $123 per share. Resurgence thus obtained a bare majority of Seaman's common stock. In addition, Management sold Resurgence an option to purchase additional shares from Management by the end of the year, which was subsequently exercised.[11]

On June 23, 1999, Rubin removed Golden and Ruocco, plaintiffs' board designees, from their positions. He replaced them with Symington and Haney, both Resurgence employees. On June 25, 1999, Rubin allegedly informed Golden that "he was going to put Levitz and Seaman together, that the majority of the value

9. Plaintiffs did not inform the company that they obtained such advice.

10. Each of the defendant groups, but especially Resurgence, makes much of the fact that Price has been in liquidation and needs to find an exit strategy for its Seaman investment. Defendants argue that because Price wanted to sell its shares, it hoped to use Rubin's interest in a merger as an avenue to gain leverage to force a favorable buyout. Thus, defendants argue that Price's interest in this litigation is not to protect Seaman but to force a buyout of its shares. Although in some situations, a plaintiff's investment objective might affect the court's analysis, I see no reason to consider these facts in great detail

on this motion. First, Price is clearly not abusing the judicial system in any way, and has a right to protect its investment, assuming it fails to achieve a buyout. Moreover, defendants do not call into question Marks' motivations in any way. The *ad hominem* attacks on Price are thus immaterial to my analysis.

11. While plaintiffs assert claims against Management with respect to their sales of control shares to Rubin, and certain evidence regarding the timing of those sales affects my analysis, Management's liability arising out of those sales, if any, was not the subject of this motion.

would go. to Levitz, and that there was nothing Ruocco and Golden could do to stop the transaction." [12] After removing the Price and Marks designees, Rubin appointed Symington to Seaman's Compensation Committee. He thus controlled senior and executive management's compensation.

## D. Barry Ridings is Introduced as an Independent Director

Soon after replacing plaintiffs' board designees with his own, Rubin proposed as a Seaman director Barry Ridings, an investment banker who had recently left his long time position at Deutsche Banc Alex. Brown ("Alex Brown") to become the head of the Lazard Frères & Co., L.L.C. ("Lazard") restructuring department. Rubin introduced Ridings to the board as a potential independent director. His background gave him expertise and special ability to evaluate transactions available to Seaman including, principally, a merger with Levitz.

At the board meeting of July 28, 1999 (and on later dates), Alperin and Peraldo, the independent directors, inquired into Ridings's capacity to act free from Rubin's influence. Ridings explained that he had worked on several debt restructurings in which Rubin was a significant creditor, but that Rubin was usually "on the other side." The independent directors thus believed Ridings to be independent himself, and apparently relied on him for his expertise and advice.

There is evidence in the record that Ridings was less than totally forthcoming with the independent directors.[13] On June 12, 1999, Ridings's restructuring group at Lazard was hired to represent the creditor's committee, co-chaired by Resurgence, in the bankruptcy of NextWave Personal Communications, Inc. The committee agreed to a monthly retainer of $150,000.[14] Plaintiffs assert that Ridings has additional significant dealings with Resurgence and Rubin.[15]

While defendants assert that none of these connections is material to Ridings or Lazard, the record is clear that Ridings did not disclose these connections to the independent directors. This fact is significant, at least on this limited record, because the independent directors questioned Ridings, when he was first introduced to the board on July 28 and during later meetings, about his independence of Rubin.[16] Ridings's silence in light of such pointed questioning at least creates some doubt about his independence.[17] I note also Ridings's eagerness to endorse

---

12. Pl. Op. Br. at 15.

13. The parties briefed the issue of Ridings's independence quite well. At Oral argument, however, there was little mention of his involvement as a Seaman director. While the record evidence creates doubt about Ridings's hiring and subsequent conduct, I expect that at trial, the details of his connections with Rubin and the extent of his work on behalf of the independent directors will become clearer.

14. Defendants state that the bankruptcy court lowered this figure.

15. For example, Ridings' group represents the creditors' committee and stands to gain a 1.5% success fee in the TV Filme bankruptcy, in which Resurgence is involved. Plaintiffs do not, however, explain precisely how much control Resurgence may have over this committee.

16. Indeed, Rubin's contacts with Ridings only became known during depositions.

17. Alperin and Peraldo clearly perceived Ridings to be conflict free. For example, it appears that Alperin first learned of a potential conflict by Ridings during his deposition.

Rubin's subsequent merger proposal[18] and his suggestion that the independent investment bankers hired to evaluate that proposal overly favored Seaman's point of view.

### E. The Independent Committee is Created and Thereafter Pressured

In August 1999, at Rubin's urging, Seaman created a three person special committee consisting of Alperin, Peraldo (both of whom are unquestionably independent), and Ridings, for the purpose of evaluating a potential Seaman/Levitz transaction (the "Special Committee"). The Committee hired Alex Brown as their financial advisor and the law firm of Swidler Berlin Shereff Friedman, LLP ("Shereff Friedman") as independent counsel. Additionally, the Special Committee sought the advice, input and guidance of Management. The Special Committee made slow progress because Alex Brown's analysis led it to the view that Levitz was not worth nearly as much as its representatives thought.

Rubin tried to accelerate the process, placing phone calls to several Seaman representatives, including McGeough and Rosenberg. McGeough took handwritten notes of a November 11, 1999 telephone conversation he had with Rubin. According to McGeough's notes, Rubin was "pissed off." McGeough testified as to his understanding that Rubin wanted him to be "less conservative" about evaluating Levitz's financial prospects.[19] Rubin was upset because Management was "dragging its heels in terms of reviewing or attempting to effectuate a transaction with Levitz."[20] McGeough recorded Rubin's instruction that Management "must lead and direct Alex and independent committee," and that Management must "be men."[21] Rubin wanted McGeough to call Leo (Peraldo) and convince him to endorse the deal. According to McGeough's notes, Rubin also indicated that if Management failed to persuade Alex Brown and the Committee of the merits of a Levitz transaction, he would "drag these [companies] to altar & all repercussions of such."

McGeough immediately contacted Halper and Rosenberg, conveyed to them Rubin's views, and scheduled a conference call that afternoon so that Rubin could discuss the matters in greater detail with Management. At that time, Management indicated to Rubin that while they supported the deal in general terms, they had significant concerns, including valuation matters such as the fairness of the "splits", in which they had no expertise. Management also indicated that they would allow Peraldo to make up his own mind, as he was a member of the Special Committee, and that they found it difficult to accept Levitz's financial figures at face value.

McGeough recorded Rubin's response. Among other comments, Rubin indicated that Management had "deferred too much to the board and shareholders," and that "honesty to a fault is a negative when [Management] should be in marketing mode to promote the deal." Rubin advised that, since Alex Brown was competent to address the "splits," he wanted Management to "provide guidance" as to Levitz's numbers. Specifically, Rubin encouraged Management to ascribe to Levitz higher

---

**18.** In addition to other evidence of Ridings's view of the merger, which is discussed below, Alperin allegedly stated that "Ridings was pushing for a deal and describing [Levitz] as a great opportunity before he knew anything about [Levitz]." Golden Aff. ¶ 23.

**19.** McGeough Dep. at 251.

**20.** *Id.* at 257.

**21.** McGeough indicated that Rubin actually used this term.

terminal multiples and lower discount rates and to supply Alex Brown with the exact opposite analysis for Seaman, thus impacting valuations in Levitz's favor.[22] Rubin indicated that if Alex Brown's analysis did not comport with his views, Resurgence, Alex Brown and the Independent Committee would have "irreconcilable differences."

According to these notes, Rubin commented on his successful seven year relationship with Management, stated that if not for him, there would be no Seaman, and mentioned that he was giving Management the opportunity to make over $100 million.[23] Responding to Management's stated concerns for their fiduciary duties and potential liability, Rubin indicated that because Kim (Golden) and Rob (Ruocco) would not have dissenters' rights under Delaware law, they could not sue. Even if they did, Rubin added, the suit would be against the combined entity and not Management.

### F. The 65/35 Split is Rejected as Grossly Inadequate

On November 17, 1999, Rubin formally proposed to the Seaman board a merger with a 65/35 valuation split in Levitz's favor. The record shows that Management, although willing to discuss *some* transaction, did not share Rubin's view of the

merits of the proposal.[24] McGeough's notes dated December 9, 1999 evidence Management's position at that time regarding Ridings's suggestion of a 60/40 split favoring Seaman. Point one on the notes of that conversation states "No valuation [that the management] team will agree on without liquidating some of their equity."

In contrast with Management's and Alex Brown's view that the proposal was wholly inadequate, Ridings advised Rosenberg that he thought the proposal may be fair because "Levitz is worth more than Seaman's." According to Rosenberg, Ridings also opined that Alex Brown was being "too pro, in other words, they—they were more conservative to the Levitz side and more pro Seaman's as far as valuations."[25] Ridings thus encouraged Rosenberg and the Special Committee to make a counterproposal along the lines of his suggested 60/40 split favoring Seaman.

While Rubin (supported to some extent by Ridings) sought to convince Management and the Special Committee that Levitz was worth more than Seaman, Alex Brown believed that Levitz's financial forecasts were not credible, and that the company's true state could be far worse than was disclosed. Alex Brown unequivocally indicated that if a deal could be done at all,

**22.** In his deposition, McGeough claimed that his notes merely reflect Rubin's effort to explain to Management the type of information Alex Brown would address in doing its work.

**23.** While it appears that Management understood the import of Rubin's suggestion or offer, it is also clear that nobody actually thought he was specifically offering $100 million, just that he was trying to entice Management of the "benefits" of the deal.

**24.** Rosenberg explained that McGeough had contended that Seaman was worth "anywhere from very much more to much, much more" and that he and Halper generally agreed with

this evaluation. Rosenberg Dep. at 127. Rosenberg also testified that Management kept Senior Management apprised of the various proposals and Senior Management "had real concerns of splits and wanted to know what their opportunity would be to liquidate some of their position because they did not want to be thrown into a situation where they would be participating in a split they might not agree upon that was the bulk of their—their wherewithal and that was not a risk they were willing to take." *Id.* at 135–36.

**25.** Rosenberg Dep. at 130.

the exchange ratio would have to weigh significantly in Seaman's favor.

Management communicated to Rubin their concern about their credibility as a team and would not endorse "projections that far outside the range of reasonable expectations." On December 3, 1999, Alex Brown reported that the 65/35 split for Levitz was not one with which they could concur, and advised, instead, that an 80/20 or 75/25 split *favoring Seaman may* be a fair exchange for Seaman's stockholders. The Special Committee then rejected the 65/35 split favoring Levitz. Instead, it proposed a 75/25 split favoring Seaman, contingent on certain factors, including obtaining a fairness opinion from an investment banker. However, when Levitz's actual year-end financial figures lagged their projections, Management believed that even the 75/25 split was unfair to Seaman. Before Levitz could respond to the offer or Seaman could withdraw it, however, Rubin proposed a structurally different transaction.

## G. Rubin Proposes the Management and Shared Services Agreements

Defendants urge me to gloss over the negotiation of the proposed merger. They claim that the issue is a "red herring" raised by plaintiffs. Further, they state that, since the merger was never consummated, I should either apply a "no harm-no foul" view of these matters or credit Ridings and Management for their independence in resisting Rubin's concededly self-interested efforts. I disagree. The history of Rubin's conduct is integral to understanding the negotiation process underlying the subsequent approval of the Challenged Transactions.

In my preliminary view, Rubin was forced, against his apparently strong and unquestionably aggressive will, to give up his quest for the Seaman/Levitz merger that would salvage Resurgence's stake in Levitz. Positing that this occurred specifically because of the use of an independent committee and its reliance on independent financial and legal advisors, I consider what next transpired.

### 1. The Proposed Agreements and the LHFI Exchange Offer

Rubin proposed, on January 5, 2000, a transaction in which Seaman would manage Levitz's 20 east coast stores and provide additional operational services for all of Levitz. Seaman's managers, who are understood by all parties to be leaders in their field, having exceptional and unique skills,[26] would share those skills with Seaman's principal competitor for a period of five years. In exchange, Seaman would receive a fee, ultimately negotiated to be $3 million for the first year of the contract and $3.5 million per year for the final four years.[27] The record provides no indication that any person involved with Seaman ever before contemplated such a transaction with Levitz.

Rubin's proposal also contemplated the creation of a new holding company, LHFI, to own 100% of Levitz and at least the 54% of Seaman that Resurgence now holds. Resurgence would contribute all of its Seaman shares to LHFI in exchange for LHFI equity. Levitz's creditors would also exchange their claims for equity

---

26. Indeed, the employment contracts with each member of Management specifically identified these unique skills and stated that if the managers worked for a competitor, Seaman would be irreparably harmed and would be entitled to injunctive relief.

27. Defendants point to various cost savings (none of which were actually quantified by Management or the board) as an added benefit of the Agreements.

stakes in the new company. Finally, Seaman's other stockholders (principally Price and Marks) would have the opportunity to exchange their Seaman shares for equity in the Seaman/Levitz holding company. As defendants point out, this last step is structured as a voluntary exchange offer, and not the forcible exchange inherent to a merger.

The implied exchange ratio at the LHFI level mirrors the 60/40 equity split favoring Levitz that the Special Committee rejected as grossly unfair.

## H. Management Almost Exclusively Handled the Negotiations

### 1. *The Failure to Employ Independent Advisors Handicapped Management*

Seaman's approach to analyzing Rubin's January 5 proposal leads me to infer that Rubin purposefully avoided the procedural hurdles (such as independent advisors) that scuttled his merger proposal. Seaman's counsel conceded during oral argument that there is no evidence that the board formally made the following critical decisions.

First, the Special Committee simply stopped meeting. Defendants assert that the Special Committee functioned on a de facto basis, and "were given the leading role in guiding and advising Mr. Rosenberg and other executive management in their work." [28] The record indicates, however, that Ridings was the only "independent" director involved in the structure and negotiation of the Agreements. Management handled virtually every aspect of negotiating the Agreements with Levitz representatives and simply informed the board of developments. The Special Committee did nothing and made no recommendation.

In this regard, defendants argue that Rubin, Haney and Symington removed themselves from the negotiating process so as not to taint Management's efforts. The record refutes this assertion. Management learned of the proposed Agreements through Rubin, before it was presented to the independent directors. On February 29, 2000, while Alperin was out of the country and without inviting Peraldo's participation, Rubin held a private two-hour meeting with Management at Resurgence's office to discuss progress on the Agreements. Also, the Resurgence representatives attended and participated in the March 2 board meeting at which Management presented its views of the Agreements and the board determined how to proceed.

Second, neither Alex Brown nor any other independent financial advisor was retained to analyze the new proposals. Defendants assert that because the Agreements relate so inherently to operational matter they are beyond the scope of an independent advisor's expertise. While this might be true, it ignores the circumstances surrounding the decision not to retain such advice. Management repeatedly noted its discomfort with valuation related matters and expressed its interest in having Alex Brown's advice. Moreover, besides the easily quantified annual management fees, the benefits to Seaman of this transaction relate to cost savings and supposed synergies. Quantifying such benefits is precisely why people retain expert financial advisors. Without this advice, Management was limited in its ability to understand these supposed benefits of the transactions.

Finally, no effort was made to involve Shereff Friedman in the new round of

---

**28.** Seaman Ans. Br. at 14.

negotiations. Instead, Seaman's counsel, Jones, Day, Reavis & Pogue, *which also represents Resurgence on a regular basis,* was selected to advise Management with respect to the Agreements.

### 2. *Management's Concerns and Efforts to Negotiate the Agreements*

The handwritten and formal documentation of Management's analysis establishes that, at least initially, Management found it difficult to comprehend how the proposed Agreements could be fair to Seaman if the proposed merger was not. Indeed, McGeough, in his notes dated February 17, 2000 asked, "Why would [Levitz's] performance under a service agreement be significantly better than in a merger if same [management] team is directing process?" Despite their reservations, there is substantial evidence in the record showing Management's understanding that Rubin was determined to achieve a deal "no matter what." Thus, Management kept working until a deal was reached.

In late January, Management prepared a "reference sheet" that listed factors to consider in evaluating the Agreements. Defendants use this document to show how much progress Management made in improving the deal from Seaman's point of view.[29] The document also illustrates Management's initial aversion to the proposal. Among other problems, Management listed the disruption to Seaman's business, costs of integrating the businesses and noted that "[f]or approximately two years senior management will spend majority of their time on developing servicing business [i.e., services for Levitz] to the potential detriment of retail business."

Beside the negatives, Management immediately recognized the general benefit of the Challenged Transactions that defendants repeatedly stressed in their briefs and at oral argument: cost savings related to a unified advertising budget and integrated "back-office" operations. However, Management perceived "[s]ignificant cost savings for Levitz, difficult to quantify savings for Seamans."

Finally, Management's conclusion was two-fold: (1) "Reject as currently proposed: it makes no business or economic sense" and (2) "If Board wish us to pursue it, we want it on record we disagree, however will follow Board's direction—need Alex Brown!"

In early March, when the substance of the Agreements came closer to their final form, Resurgence purchased 100% of Senior Management's shares in Seaman. Further, Resurgence purchased additional shares from Management, so that in less than a year, Rosenberg, Halper and McGeough had liquidated 75% of their original Seaman holdings. Even assuming for present purposes that these transactions were proper stock sales by the management group, it is clear that by selling all or nearly all of their equity in Seaman, they limited their risk from the Agreements.[30] Presently, only Seaman and plaintiffs stand to lose if, in fact, the Agreements are unfair to Seaman.

---

**29.** I am convinced that Management did, in fact, make progress from the obviously inadequate starting point. I also note, however, that none of the defendants spend much effort arguing that the *result* of those negotiations is actually *fair* to Seaman; only that it provides benefits and is better than the initial proposal.

**30.** I also note that the record is replete with references to reminders by Rubin to Management that their compensation would increase significantly to account for their added responsibilities in running Levitz as well as Seaman. There is even some indication that Seaman management might be made directors of LHFI.

## I. Management Ultimately Provides a Tepid Endorsement of the Challenged Transactions

At the March 2, 2000 board meeting, Management discussed their progress on the Agreements and their remaining concerns with the full board. The board instructed Management to keep working on the proposals. Over time, Management clearly extracted protections and benefits for Seaman not included in the opening proposal. Finally, at the April 5, 2000 meeting, the board requested "management's position on entering into the [Agreements]. Mr. Rosenberg read a statement, a copy of which was ordered attached to these minutes, outlining the position of management." [31]

Management's position statement (the "Statement") begins by listing the general benefits to Seaman, including the following: ability to generate profits "from management fees, service fees and synergies without a large investment" and "Seaman[ ] does not have any of the capital risks of Levitz." The Statement then explains:

> When these servicing agreements were presented to the Board on January 5, 2000, we were directed by the Board to analyze the proposal. *This is a unique contractual arrangement and therefore, we did not have any yardstick to measure the proposal against. In addition, we did not have financial advisors to guide us.* However, we spent considerable time and effort developing our analysis, using the expertise of *some* of the board members and our outside

counsel at Jones Day. We presented our finding to the Board on March 2, 2000.

> Based upon our findings the Board directed us to continue to negotiate this agreement.... We have negotiated this agreement to the best of our ability, keeping the Board informed during the process. *We believe that ... we have negotiated significant improvements in these agreements from the initial proposals.* [32]

The Statement then lists the benefits that Management negotiated, as follows: (1) guaranteed payments for all five years; (2) enhanced Seaman termination rights; (3) Seaman can resolve most conflicts in its favor; (4) winding down costs are borne by Levitz; (5) Levitz pays the added employee related and certain other costs; and (6) Seaman holds a right of first offer if Levitz plans to sell its east coast stores. Finally, the Statement documents Management's ultimate conclusion:

> "We believe these Servicing Agreements *are significantly better than the terms of the Merger that Levitz proposed.* Therefore, we as management feel comfortable in recommending to the Board that the Company *could* enter into these agreements." [33]

Following the reading into the record of the Statement and some "further discussion," the board approved the Agreements. It appears to me that Management sought, *consistent with conclusion point 2 of the late January reference sheet for the Agreements,* [34] to be on record explaining the difficult circumstances surrounding their

---

31. Minutes of April 5, 2000 board meeting.

32. *Id.* (emphasis added).

33. *Id.* (emphasis added).

34. See *supra* at section III.H.2 (Conclusion point I of that document states "Reject as

currently proposed: it makes no business or economic sense" and point 2 states "If Board wish us to pursue it, *we want it on record we disagree,* however will follow Board's direction—need Alex Brown." (emphasis added)).

assignment and their belief that they had extracted a transaction more beneficial to Seaman than the rejected merger proposal.

The real import of the Statement, in my view, however, is that Management did not opine that the Agreements actually represent a worthwhile venture for the company, much less one that was on fair terms. Similarly, while defendants focus on proving that Seaman will get *certain benefits* from the Challenged Transactions, there is little focus on whether the Agreements themselves are actually beneficial and worthwhile for the entity.[35]

## J. The Parties' Divergent Views of the Merits of the Agreements

Plaintiffs attack nearly every element of the Challenged Transactions. According to plaintiffs, Seaman should simply allow Levitz to fail and liquidate. In short, plaintiffs attack as foreign to their understanding of capitalism and the corporate law the very concept of dedicating time, skills and resources for the purpose of aiding a direct competitor and providing it with the tools needed to succeed. Put less dramatically, plaintiffs assert that Rubin's desire to salvage his Levitz investment is the sole driving force behind the Challenged Transactions. This point is hardly contradicted by defendants.

In support of their challenge to the concept underlying the Agreements, plaintiffs point out that at the end of five years, Seaman's principal competitor may reemerge as a viable threat, having enjoyed the benefit of learning and understanding how Management successfully operates retail furniture stores.[36] At the same time, Seaman may suffer because Management is distracted from considering Seaman-related issues while it focuses on revitalizing Levitz.

In challenging the substantive terms of the Agreements, plaintiffs identify several legal and practical issues that they contend were either never considered or, if considered, evidence the gross unfairness of the Challenged Transactions. Assuming these issues are as glaringly pertinent as plaintiffs contend, independent advisors would likely have raised these issues and allowed a special committee to properly address them.[37]

Plaintiffs' specific attacks on the terms of the Agreements include questions about Levitz's ability to satisfy its side of the bargain. They say that Levitz's disclosure statements are not reliable. Further, Seaman may have to divert its own cash flow for Levitz's benefit. Plaintiffs also assert that the Challenged Transactions involve *per se* price fixing, and therefore subject

**35.** In other words, defendant's arguments rests on the assumption, which I believe was shared by Management, Senior Management and the independent directors, that Seaman was inevitably going to enter some form of what ultimately became the Challenged Transactions. Only by accepting the propriety of this inevitable result can one properly focus solely on the extent of benefits extracted.

**36.** In that regard, it is striking that neither Management nor the board appear to have considered either the benefits of the Agreements to Levitz or the decline in Seaman's profits that can be expected from a more

successful Levitz. Indeed, "[t]he materials presented to Seaman's Board at its March 2000 meeting assume that the only difference between Seaman's EBITDA due to servicing the [Agreements] would be the servicing [and management fee]] revenues, thereby ignoring any effect the [Agreements] would have on Seaman's sales and revenues." Fischel Aff. ¶ 15 n. 3.

**37.** Further, independent advisors may have estimated the value of these Agreements to Levitz, which, contend plaintiffs, dwarfs the value running to Seaman, so that Management could better understand its leverage.

Seaman and its stockholders to potential liability for *per se* violations of federal and state antitrust laws. Plaintiffs claim that the substantial risk that Seaman will become responsible for Levitz's liabilities to third parties, as well as its ERISA-related liabilities, should Levitz fail, completely outweighs the marginal benefits offered by the Challenged Transactions.

Finally, plaintiffs take cold comfort from two aspects of the Agreements that they do not believe will operate properly. Specifically, the Agreements, as finally structured, allow Management to resolve most conflicts in Seaman's favor. Plaintiffs assert that there is no assurance that Management, without the help of an independent process, will actually do so, especially in light of their perception that Rubin will constantly seek to exert control for his own benefit. Additionally, while the Agreements grant Seaman termination rights in the event Levitz does not perform its side of the Agreements or Seaman's financial figures deteriorate, plaintiffs assert that as long as Rubin is in control, there is no chance that any termination rights will be exercised to further Seaman's interests.

Defendants respond by listing benefits that Seaman will achieve from the Agreements and impeaching plaintiffs' various liability concerns. They submitted, in addition to Rosenberg's affidavit, an affidavit from Stephen F. Cooper, a Managing Partner of Zolfo Cooper, LLC, which is a firm specializing in consulting with respect to financially distressed companies.[38] Cooper states that in his opinion, "Seaman's management ably acquitted themselves by negotiating the agreements in a fashion that will likely provide Seaman with substantial economic benefit." [39]

Specifically, Cooper explains several benefits that Seaman will receive and challenges plaintiffs' liability concerns. First, Seaman is guaranteed minimum payments of $3 million for the first year and $3.5 million per year for the last four years.[40] Additionally, Rosenberg points out that in the last three years of the deal, Seaman may, if Levitz is successful, obtain an additional "incentive fee." [41]

Cooper identifies as a second benefit, "less open to precise dollar calculation ... the synergies Seaman ought to realize." [42] Cooper does not, however, define any such synergies.

Cooper further states that the Agreements "will allow Seaman to spread its warehouse costs and negotiate better advertising terms and freight rates. Its greater inventory purchasing power will allow it to drive better bargains...." [43] Finally, since "Seaman will be managing

---

**38.** While defendants submit this affidavit, they have moved to exclude the affidavit of Daniel R. Fischel, Dean of The University of Chicago Law School, on the grounds that he is not qualified to give an expert economic opinion and that his affidavit is too equivocal *to constitute an admissible expert opinion.* I will deny that motion.

**39.** Cooper Aff. ¶ 8. I focus here on Cooper's affidavit solely because it generally encapsulates the arguments set forth in Rosenberg's affidavit and in defendants' briefs.

**40.** Cooper states that "[t]aking into account the projected incremental cost for the agree-

ments of about $1 million annually, the minimum payments represent about 5–8% EBITDA growth." Cooper Aff. ¶ 9.

**41.** There is no discussion, however, of whether Management considered, before endorsing the Agreements or even as part of this litigation, whether those incentive fees are proportionate to or capable of compensating Seaman for the lost business attributable to additional sales in Levitz's stores.

**42.** Cooper Aff. ¶ 10.

**43.** Cooper Aff. ¶ 11.

Levitz in that region, it will be able to position the Levitz and Seaman merchandising programs so as to be complimentary."

Cooper also responds to plaintiffs' criticism of the Agreements. He states that "[t]here is simply no logical or historical reason to believe that the existence of added responsibilities for Senior Management will be a detriment to Seaman."[44] He also contends that plaintiffs' concerns about Levitz's financial condition are unfounded because plaintiffs forget "that Levitz cannot emerge from bankruptcy protection ... without first satisfying the bankruptcy judge that its business plan is viable and its capital structure is such as will allow it to survive and discharge obligations."[45] Cooper's last pertinent comment is that the liability risks identified by plaintiffs are those risks generally encountered in the course of running a business.[46]

Finally, in further response to plaintiffs' antitrust concerns, which were explained in the opening and reply affidavit of Stephen D. Houck, an antitrust attorney with the law firm of Reboul, MacMurray, Hewitt, Maynard & Kristol, defendants submitted the affidavit of Stephen Calkins, an antitrust law professor at Wayne State University Law School. I need not resolve on this motion any issues of antitrust law. It suffices to note that the parties' respective affidavits, briefing and argument leaves me convinced that plaintiffs' concerns about liability are not without force.

Defendants may ultimately be correct in their view of the law. But the critical fact is that the Seaman board of directors was not advised of this potential legal risk when they approved the Agreements.

## III. LEGAL ANALYSIS

### A. Legal Standards

■ Preliminary injunctive relief will be granted only where the moving party demonstrates the following: (1) a reasonable probability of success on the merits; (2) irreparable harm if the injunction is not granted; and (3) a balance of equities in favor of granting the relief.[47]

The issue of probability of success on the merits depends critically on the standard of review. The defendants argue that, notwithstanding Resurgence's status as Seaman's majority stockholder and its admittedly conflicting interests, the decision of the Seaman board of directors to approve the Agreements is protected by the business judgment rule. This is so, they say, because those contracts are not a merger but a "business transaction." Alternatively, they argue that because Resurgence did not misuse its position of control in connection with the negotiation of the Agreements, the business judgment rule should apply. I disagree both as a matter of law and, although not material to my conclusion, as a matter of fact.

---

**44.** *Id.* ¶ 14.

**45.** *Id.* Naturally, if plaintiffs are correct that the whole purpose of the Agreements is to transfer value out of Seaman and into Levitz, then their concern about Levitz's *ability* to honor its obligations seems misguided. Also, Management negotiated to ensure that LHFI will guarantee Levitz's obligations under the Agreement.

**46.** I agree that any business should concern itself with ERISA, antitrust, and third-party liability risks. Plaintiffs' argument, however, (aside from the supposed *per se* price fixing fear) is that Seaman should not be forced to concern itself with *Levitz's* business risks.

**47.** *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (1985); *SI Management L.P. v. Wininger,* 707 A.2d 37, 40 (1998).

As to the law,[48] the Delaware Supreme Court held in *Kahn v. Lynch Communication Systems, Inc.*,[49] that the entire fairness standard applied to the review of a transaction (in that case a merger) negotiated between a controlling stockholder and the controlled corporation, notwithstanding approval of the transaction by a special committee of disinterested directors of the controlled corporation. At most, the Court held that approval by a properly functioning committee of disinterested directors would shift the burden of proof on the issue of fairness to plaintiffs. One year later, in a post-trial opinion in *Kahn v. Tremont Corp.*,[50] Chancellor Allen explicitly refused to limit *Lynch* to merger cases. He said:

> Defendants seek to limit *Lynch* to cases in which mergers give rise to the claim of unfairness, but offer no plausible rationale for a distinction between mergers and other corporate transactions and in principle I can perceive none. Thus, I conclude that under *Lynch* the operation of such a committee can only shift to plaintiff the burden of proving that the transaction was unfair.[51]

The Supreme Court reaffirmed Chancellor Allen's conclusion in its decision in the same case, when it stated that "when a controlling shareholder stands on both sides of the transaction, the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard."[52]

Defendants do not mention Chancellor Allen's opinion in *Kahn v. Tremont* and attempt to distinguish the Supreme Court's opinion in that case on the basis that it does not expressly discuss the distinction they would draw between mergers and other business transactions. This *absence* of analysis is either of no import whatsoever or, at best, indicates the Supreme Court's implicit endorsement of Chancellor Allen's *explicitly stated* inability to find such distinction. In any event, both the Supreme Court and this court explicitly held that the entire fairness standard of review applies in the non-merger context to interested transaction involving controlling stockholders. Thus, I have no difficulty concluding that the entire fairness standard applies here.[53]

Moreover, based on the record before me, I am satisfied that defendants

---

**48.** The factual record in the context of this preliminary injunction is uniquely suggestive of Rubin's improper influence of the course of events. Thus, defendants' novel legal assertion that Resurgence's status as majority stockholder is not enough to invoke an entire fairness analysis of the Agreements is irrelevant. Even if that were true, I conclude, at this stage of the proceedings, that Rubin and Resurgence actually exercised their control over Seaman in such a way as to require them to demonstrate the fairness of the Agreements.

**49.** Del.Supr., 669 A.2d 79 (1995).

**50.** Del.Ch., Civ.A. No. 12339, mem. op. at 18, Allen, C., (March 21, 1996), *rev'd on other grounds,* Del.Supr., 694 A.2d 422 (1997).

**51.** *Id.*

**52.** *Kahn v. Tremont,* 694 A.2d at 428. See also *Ryan v. Tad's Enterprises, Inc.,* Del. Ch., 709 A.2d 682, 689 (1996), *aff'd* Del.Supr., 693 A.2d 1082(1997) (Order).

**53.** I also note that the record on this motion easily satisfies whatever initial burden plaintiffs had of showing some basis for invoking the fairness obligation. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983). The record shows a self-dealing transaction in which the majority stockholder, Resurgence, is receiving a special benefit and Seaman is suffering an apparent detriment. *See* D.A. Drexler, L.S. Black, Jr. & A.G. Sparks, III, *Delaware Corporation Law and Practice,* § 15.11 at 15–74 (1999).

will bear the burden of proving fairness at trial. They quite consciously chose not to employ any independent bargaining mechanism in negotiating the Agreements. They abandoned the Special Committee and its independent legal and financial advisors. Instead, Management "bargained" with Levitz and took legal advice from the same law firm that represents Resurgence. Predictably, this "negotiation," unlike the merger discussions that failed precisely because of these procedural safeguards, succeeded in arriving at a transaction satisfactory to Levitz and Resurgence. The Agreements were then presented to the full Seaman board of directors and approved. Nothing about this process would lead me to conclude that the burden of proof on the issue of fairness will be shifted at trial to plaintiffs.[54]

Of course, in the context of a motion for a preliminary injunction, the moving party must shoulder the burden of showing a reasonable probability of ultimate success on the merits. Thus, it is not enough for plaintiffs merely to convince me that the entire fairness standard applies and then rest. Instead, they must carry the burden of showing such a lack of fairness in the Challenged Transaction as to establish a reasonable likelihood that the defendants will be unable to meet their burden of proving fairness at trial.[55]

## B. Probability of Success on the Merits

 Plaintiffs have shown a reasonable, and indeed a strong, probability of success on the merits of their claim.

 The test of entire fairness is an "exacting" one and, where it applies, the "challenged transaction must withstand rigorous judicial scrutiny."[56] Of course, there are two components to the concept of entire fairness: fair dealing and fair price.[57] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[58] Fair price "relates to the economic and financial considerations of the proposed [transaction]

---

**54.** Defendants argue that Rosenberg, who is Seaman's CEO, is legally independent of Rubin or Resurgence and, thus, 4 out of 7 of the Seaman directors were "independent" of the majority stockholder. Although the record does suggest that Rosenberg and the other members of Management resisted certain of Rubin's threats and blandishments, there is nothing to suggest that Rosenberg was actually able to act independently of Rubin in connection with the approval of the Agreements. Indeed, the record suggests otherwise, and I cannot regard Rosenberg as legally independent. *See Rales v. Blasband*, Del.Supr., 634 A.2d 927, 937 (1993). Moreover, the existing record creates a substantial issue about Ridings's independence, a point requiring further inquiry at trial. Thus, only 2 of the 7 directors, Peraldo and Alperin, neither of whom knew of Ridings's contacts with Resurgence, are clearly "independent" for the purposes of my analysis. In the circumstances, the fact that the Agreements received unanimous board approval (including an initial approval of the independent directors) does not shift the burden of proof on fairness.

**55.** *See, e.g., In re Trans World Airlines, Inc. Shareholders Litig.*, Del.Ch., Civ.A. No. 9844, mem. op. at 18–19, 1988 WL 111271, Allen, C. (Oct. 21, 1988) (party seeking injunctive relief, even if other side will bear burden of proof at trial, must establish to a certain "degree of confidence" that the merits warrant the relief sought); *Cascella v. GDv, Inc.*, Del. Ch., C.A. No. 5899, letter op. at 2–3, Brown, V.C. (June 21, 1979) (party seeking injunctive relief bears burden of showing a likelihood that "under the facts the defendants will be unable to establish intrinsic fairness").

**56.** *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 (1989).

**57.** *Weinberger*, 457 A.2d at 711.

**58.** *Id.*

...." [59] In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole.[60]

I have described both the procedural and price aspects of the Agreements at length earlier in this opinion and will not repeat all that has been said. Based on my preliminary factual findings, there is a substantial likelihood that defendants will be unable to satisfy any aspect of the fairness analysis and that, taken as a whole, the Agreements are likely to be judged unfair to Seaman. Briefly, the following observations support my conclusion.

1. *Timing*. The timing of the transaction is driven entirely by Resurgence's desire to rescue its investment in Levitz. Perhaps most fundamentally, there is nothing in the record to indicate that—left on its own—Seaman would *ever* seek out or enter into an arrangement of the sort contemplated by the Agreements. Certainly, the Agreements proposed by Rubin were *never* part of any Seaman business plan.

2. *Initiation*. Rubin initiated the idea of a business transaction between Seaman and Levitz and promoted it relentlessly. He disregarded the negative conclusions of P & M, which was then excluded from further involvement in the process. Resurgence purchased enough shares from Management to obtain an absolute majority and immediately removed Golden and Ruocco (who expressed skepticism about a. Levitz merger) from the board of directors. Rubin secured the appointment of Ridings to the board and to the Special Committee without full and complete disclosure of Ridings's relationship with Resurgence. When the merger discussions failed, Rubin effectively disbanded the Special Committee and discharged the Committee's independent legal and financial advisers. In the course of Management's "negotiation" of the Agreements with Levitz, Resurgence purchased additional shares from Management and Senior Management, evidently to mollify their concerns over the effect of the Agreements on the value of Seaman.

3. *Negotiation*. "Arm's length negotiation between independent bargaining parties is a 'well recognized touchstone of fair dealing.' Conversely, its absence is evidence of unfair dealing." [61] Defendants argue that there were real arm's length negotiations over the terms of the Agreements. Indeed, there is evidence in the record that Management made a substantial effort to secure better terms for Seaman than those first proposed by Resurgence and Levitz, and Management was successful in certain respects. However, there is nothing to suggest that the negotiation process replicated or even approximated that which would occur at arm's length. Instead, the record strongly suggests that Management accepted the fact that a deal would be done and simply strove to arrange better terms for Seaman. At the April 5 board meeting, after making additional sales of Seaman stock, Management reported only that the Agreements were a better deal than Resurgence's grossly unfair merger proposal and that the directors "could" approve them.

■ 4. *Structure*. The "structure" of the Agreements is unremarkable except

59. *Id.*

60. *Id.*

61. *Kahn v. Dairy Mart Convenience Stores, Inc.,* Del.Ch., Civ.A., No. 12489, mcm. op. at 19, 1996 WL 159628, Jacobs, V.C. (Mar. 29, 1996) (citation omitted).

for the obvious and troubling conclusion that they are designed and structured to restore the competitive position and power of Levitz in order to salvage Resurgence's investment in that company. Plaintiffs argue that this fact renders the Agreements contrary to the fundamental principal of Delaware corporate law that a controlling stockholder may not use corporate assets to advantage itself to the corporation's disadvantage.[62]

5. *Disclosure to Directors.* The incomplete disclosure to the directors, especially Alperin and Ruocco, about Ridings's relationships with Resurgence is troubling. They evidently relied on him and his expertise in approving the Agreements. If, as plaintiffs argue and parts of the record suggest, Ridings saw his role as one of promoting a deal with Levitz rather than advocating and protecting the interests of Seaman, his participation in the process *raises* rather than resolves issues of fairness.

6. *Approval by Directors.* Alperin's and Peraldo's approval of the transaction is some evidence of fairness. On the present record, however, I cannot give much weight to it for several reasons. First, as just discussed, Ridings's participation in their deliberation is problematic. Second, there is record evidence that they, like management, concluded that some deal with Levitz was inevitable and agreed to this one simply because it was better for Seaman than the grossly inadequate merger proposal. Third, the record does not support the conclusion that the directors' deliberations were fully informed. Plaintiffs have raised a series of legal and business issues, such as potential antitrust and ERISA liabilities and the viability of alternatives to the Agreements, which likely warranted consideration by the directors in their deliberations. At this stage of the proceeding, the record does not reflect that the board of directors considered or discussed these issues.[63]

7. *Price.* Of course, Seaman is due to receive some consideration for the management and other services it is promising to deliver. It will receive $17 million over the course of five years and potentially could receive additional "incentive" payments. In addition, there are other less tangible benefits flowing to Seaman of a synergistic nature, such as cost savings and volume discounts that it may realize.

On the other side of the ledger are a substantial diversion of the time and attention of Seaman's management, a diversion of capital resources and added costs. Also, there are various risks of potentially material liabilities flowing from the entanglement of Seaman into the affairs of its largest competitor as it emerges from a long and difficult bankruptcy. Finally, there must be some fundamental concern that increased revenues for Levitz will come at the expense of decreased revenues for Seaman.

It is difficult to evaluate the interplay of these various factors, in part because there was no expert analysis prepared for the board of directors in conjunction with its approval of the Agreements. In this regard, however, it is important to note that Senior Management insisted on selling 100% of their shares and Management sold more of their remaining shares in March

---

**62.** Citing *Sinclair Oil Corp. v. Levien*, Del. Supr., 280 A.2d 717, 720 (1971), and *Thorpe v. CERBCO, Inc.*, Del.Ch., Civ.A. No. 11713, mem. op. at 17, 1995 WL 478954, Allen, C. (Aug.9, 1995), *aff'd in part, rev'd in part*, Del. Supr., 676 A.2d 436 (1996).

**63.** The parties sharply disagree over the merits of these issues. I have no occasion to resolve them at this time, other than to note that the issues are significant and present some material risks to Seaman.

2000, just as the final terms of the deal were being arranged. This fact is suggestive that, despite defendants' after-the-fact efforts to prove the fairness of the Agreements, the management group perceived the fundamental unfairness of the proposal to Seaman.

My analysis of the fairness of the Agreements also requires me to look more broadly at the connection between the Agreements and the plan to reorganize Levitz. The defendants urge me to recognize, as an indication of fairness, that the plaintiffs will have the option to exchange their Seaman shares for common shares of the new holding company, LHFI, on the same terms as Resurgence. I give no credence to this argument because the terms of that exchange were fixed unilaterally by Resurgence and reflect the same 60/40 equity split in favor of Levitz that was rejected as grossly unfair by the Special Committee in December 1999. Insofar as the record of the failed merger negotiations shows, that split does not reflect a fair assessment of the relative values of the two companies. Rather, it is one that Resurgence chose to further its interest in reorganizing Levitz, thus, salvaging its large investment in that bankrupt company. Thus, I conclude that the relationship of the Agreements to the Levitz reorganization and the unfair valuation of Seaman implicit therein suggest unfairness.

### C. Irreparable Harm

■ I am also persuaded that plaintiffs have shown the sort of imminently threatened irreparable harm that justifies the extraordinary remedy of a preliminary injunction.

The imminence of the threat can be viewed at least two ways. First, although the Agreements are not yet fully operative, their existence is diverting the time and attention of Seaman's management from Seaman's business to the effort to rescue Levitz. Indeed, the Agreements themselves contemplate that the parties will use the time period before the Levitz plan of reorganization is approved (and the other conditions are met that precede the operation of the Agreements) to negotiate a detailed plan of implementation. Thus, an element of the harm I find to be irreparable is already occurring. Second, it seems likely that if I refuse the injunction, the Agreements will become effective before this matter can be tried and a final determination reached.[64] Once that happens, the full measure of the irreparable harm will occur. For these reasons, I am satisfied that the need for injunctive relief is not speculative or remote but real and sufficiently imminent in nature to require that I act.[65]

The harm threatened by the Agreements includes, among other things, that (i) Management's time and attention will be substantially diverted from Seaman's business, (ii) Seaman will become operationally and financially entangled with a business in unstable financial condition, (iii) Seaman's assets and management will be diverted to permit a stockholder (Resurgence) to compete directly with Seaman; (iv) Seaman will be exposed to material potential liabilities flowing either from its own illegal conduct (such as antitrust

---

64. At argument, the parties estimated the time needed to prepare for trial at between three and six months. Of course, a final decision after trial could well take weeks or months of additional time.

65. *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10-2(b)(3), 702 (1998) (hereinafter "Wolfe & Pittenger").

liability) or from its close association with a financially less secure Levitz.[66]

Defendants argue strenuously that each of these "harms" is purely economic and can be remedied in an action at law. They point out that it is possible in certain cases (generally those involving intellectual property infringement) to reasonably estimate lost profits or the diminution in enterprise value.

 It is likely that, despite unquestionable difficulties of proof, a court might estimate such damages in an action at law. Thus, plaintiffs might obtain some recovery, unless the court found the elements of damages sought to be so speculative as to be non-compensatory. Nevertheless, I do not agree that the possibility of some such monetary recovery should stay the issuance of an injunction. The harm here threatened is irreparable, in my judgment, because "in keeping with the broad discretion with which [this] court is vested in such matter '[i]t is not necessary that the injury be beyond the possibility of repair by money compensation' but only that it 'be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice.' "[67] As has been said, "[a]lternative legal redress must be clearly available and 'as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.' "[68]

Here, I have the power to prevent the occurrence of a threatened injury on a record strongly supporting plaintiffs' position on the merits. It would work an injustice on Seaman and plaintiffs to permit the Agreements to go forward with the hope that some claim for money damages (however imprecisely measured) might later be available. I find myself nearly in the position of Vice Chancellor Jacobs in *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, in which he recognized that where money damages "may be highly difficult to calculate" preliminary injunctive relief is proper.[69] In this regard, he stated:

> "To say that this Court has the power to condemn the egregious conduct involved here (as it has preliminarily done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of the conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State."[70]

Finally, I must observe that it will be considerably more difficult, if not impossible, to fashion a full and adequate equita-

---

66. Plaintiffs also point to a line of cases finding that the creation of a "listening line" between competitors constitutes a threat of irreparable harm. *See, e.g., Elco Corp. v. Microdot Inc.*, 360 F.Supp. 741, 754 (D.Del. 1973). Defendants respond that, under the cases cited, the injury is threatened to Levitz, not Seaman, that money damages are an adequate remedy and, in any case, Seaman is free to sell its trade secrets to Levitz. Seaman may learn much about the Levitz stores that it has agreed to operate and about Levitz's operations as a whole. It is still the case that Levitz will of necessity learn a lot about the way Seaman's management (which all parties agrees is highly effective) runs its business. It stands to reason that Levitz will be able to use this information to help build its business and, ultimately, to compete with Seaman. This is a species of harm that courts have recognized is irreparable.

67. *Wolfe & Pittenger* § 10–2(b)(4) at 705 (quoting *State v. Delaware State Educ. Ass'n.*, Del.Ch., 326 A.2d 868, 875 (1974)).

68. *Id.* (quoting Thomas C. Spelling & James Hamilton Lewis, *A Treatise On The Law Governing Injunctions* § 44 at 94 (1926)).

69. Del.Ch., 532 A.2d 1324, 1341 (1987).

70. *Id.*

ble remedy after trial on the merits. First, Seaman will have suffered the multifaceted negative effects on its business for some relatively substantial period of time. Moreover, at a hearing before the Bankruptcy Court, Levitz candidly acknowledged that the Agreements lie at the very heart of the Levitz plan of reorganization and that it was seeking to have those contracts put in place without the possibility of their later rescission. Even if this latter assertion is disregarded, it is certainly the case that once the Levitz plan of reorganization is approved and goes into effect many more persons will have a legitimate interest and expectation in the continued performance of the Agreements. Therefore, the remedy of rescission would be difficult to employ.

### D. Balance of the Equities

 I note first that Levitz, because it is a bankrupt, is not a party to this case. Defendants have seized on this fact to argue that the failure to join Levitz is grounds for denial of the injunction and dismissal of the action. I cannot agree. On June 14, 2000, Judge Walrath of the United States Bankruptcy Court for the District of Delaware issued an order in the Levitz bankruptcy case both denying a motion to enjoin plaintiffs from proceeding in this court and expressly granting them relief from the automatic stay provisions of the Bankruptcy Code, so they could pursue this action, including the injunctive relief now sought. Thus, the Bankruptcy Court is content to allow this action to proceed in Levitz's absence. I note also

that Levitz's interests in this matter have been forcefully represented by Resurgence.[71]

 In my opinion, Seaman faces the threat of marginal, if any, harm by the issuance of the injunction. The Agreements present no uniquely beneficial opportunity to it. Thus, the present circumstance is unlike those cases in which this court has refused to enjoin a premium acquisition proposal where no other such proposal exists.[72] Indeed, if my view of the Agreements is correct, it is likely that Seaman will benefit substantially from an injunction against its performance of what appear to be unfair contract obligations.[73] Similarly, Management, each of whom are defendants in this action, are not threatened with any harm by the issuance of the injunction. Their interests in the Agreements are the same as Seaman's.

This leaves Levitz, Resurgence and Levitz's other creditors as the parties likely to feel the bite of an injunction. It must be frankly admitted that such an order is likely to affect them substantially. At a minimum, Resurgence and Levitz may find it necessary to restructure the proposed Levitz plan of reorganization. I note, however, defendants argue in their briefs that there is no evidence in the record that Levitz "must fail in the absence of the proposed contracts." I take this to mean that there are other possible solutions to the Levitz bankruptcy that do not depend on approval of the Agreements. Thus, I am unable to speculate as to the ultimate

71. See, e.g., Moran v. Household Int'l, Inc., Del.Ch., 490 A.2d 1059, 1073 (1985) ("It is not necessary to join a person whose interests are fully protected by the parties already present in the case."), aff'd, Del.Supr., 500 A.2d 1346 (1985).

72. See Wolfe & Pittenger § 10–2(b)(5) at 720, n. 138 and cases cited therein.

73. Further, even if I am mistaken about the merits of the Agreements, defendants in no event argued that the benefits to Seaman are so substantial that denying Seaman those benefits would cause any significant harm.

impact of an injunction on Resurgence, Levitz or its other creditors.

Moreover, since I think it likely that at trial I will find the Agreements to be unfair, I see no reason to allow Levitz's creditors other than Resurgence to become intertwined in a complex exchange offer and reorganization that depends on the Agreements, which, in the end, may be undone. The public interest therefore favors the issuance of an injunction.

Balanced against these harms is the substantial, imminent and irreparable harm that I conclude is likely to befall Seaman and the plaintiffs in the absence of a preliminary injunction. Thus, plaintiffs are entitled to the relief they now seek.

Of course, the granting of a preliminary injunction is a severe remedy, not to be handed out lightly. I recognize, as I must, the possibility that I may be issuing this form of relief improvidently. For that reason, I will entertain an application from the defendants to set an expedited trial date. Similarly, in accordance with Rule 65(c) of the Rules of this court, I will require plaintiffs to post a cash or surety bond in the amount of $100,000.

## IV. CONCLUSION

For all of the foregoing reasons, a preliminary injunction shall issue enjoining and restraining the defendants from performing or taking any further action with respect to the performance of the Agreements. Plaintiffs shall present a form of order on notice.