# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MYCARRIER, LLC,<br><br>      Plaintiff,<br>      Counterclaim Defendant,<br><br>      v.<br><br>PROJECT44, LLC,<br><br>      Defendant,<br>      Counterclaim Plaintiff. | C.A. No. 2024-0705-KSJM |

## MEMORANDUM OPINION

Date Submitted: January 23, 2025
Date Decided: March 3, 2025

Raymond J. DiCamillo, Sandy Xu, Kaitlyn R. Zavatsky, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jeffrey A. Simes, Samuel J. Rubin, Alexandra V. Bargoot, GOODWIN PROCTER LLP, New York, New York; *Counsel for Plaintiff and Counterclaim Defendant, MyCarrier, LLC*.

Ryan D. Stottman, Taylor A. Christensen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Lazar Raynal, Barry Kamar, KING & SPALDING LLP, Atlanta, Georgia; *Counsel for Defendant and Counterclaim Plaintiff, Project44, LLC*.

**McCORMICK, C.**

Plaintiff MyCarrier, LLC licenses application programming interfaces ("APIs") from Defendant Project 44, Inc. ("P44") pursuant to a master services agreement. P44 has moved for a preliminary injunction to prevent MyCarrier from developing its own version of a functionality that P44's software provides. P44 also seeks to prevent MyCarrier from working with a P44 competitor to sell services that P44 offers. This decision denies the motion.

## I.    FACTUAL BACKGROUND

The facts are drawn from excerpts of deposition testimony lodged with the court, 100 exhibits submitted with briefing, and the affidavits of the parties' competing experts.[1]

### A.    Events Leading To The Agreement

P44 is a Chicago-based software-as-a-service company that operates in the supply-chain management industry. P44's software transmits information throughout the shipping industry among shippers, carriers, data providers, and

---

[1] This decision cites to the parties' submissions in Docket C.A. No. 2024-0705-KSJM by "Dkt.," and to the following exhibits submitted with briefing by "Ex." number: Exs. 1 through 58 to Transmittal Affidavit of Taylor A. Christensen, Dkt. 94; Exs. 59 through 114 to Transmittal Affidavit of Kaitlyn R. Zavatsky, Dkts. 105, 106; Exs. 115 through 125 to P44's Reply Brief, Dkt. 110. This decision also cites to the Transcript of the Hearing on P44's Motion for a Preliminary Injunction, Dkt. 123 ("1/23/25 Hr'g Tr."). The parties submitted as exhibits deposition transcript excerpts ("Dep. Tr.") of the following witnesses: P44 CTO Parthasarathy Ramachandran, Exs. 2, 64; P44 Senior Product Manager Ilias Pagonis, Exs. 3, 94, 119; P44 CEO Jett McCandless, Exs. 5, 60, 120; MyCarrier CEO Michael Bookout, Exs. 6, 97; and former MyCarrier CRO Charles Thomas Barnes, Exs. 12, 118. Because the court does not rely on the Affidavits of Michael Bookout, John Hess, and Lance Healy (Dkts. 103, 104, and 107), P44's Motion to Exclude the Affidavits (Dkt. 109) is moot.

Transportation Management Systems ("TMS").[2] P44 transmits this information through APIs—a set of rules or protocols that allow software systems to communicate with each other to exchange data, features, and functionality.[3]

MyCarrier offers a web-based shipping management platform that provides "one-stop shopping" for "less-than-truckload" ("LTL") shipments—shipments that are larger than a parcel but smaller than a full truckload. MyCarrier uses P44's Freight API platform to connect carriers and shippers in the supply chain by providing data and information regarding shipments.[4] P44 essentially serves as the pipe through which MyCarrier accesses the systems of the carriers that it then connects to the shippers.[5]

The Freight API has four products: LTL Visibility, LTL Dispatch, LTL Rating, and LTL Documents.[6] LTL Visibility provides shipment tracking capabilities. LTL Rating allows users to retrieve quotes (*i.e.*, rates) from an array of carriers through a "one to many" API call, in which P44's system makes a multitude of API calls to carriers to retrieve rates data.[7] LTL Dispatch allows shippers to facilitate

---

[2] Project44 – Company, https://www.project44.com/company/ (last visited February 28, 2025); 1/23/25 Hr'g Tr. at 10–11.

[3] Ex. 1 ¶ 35.

[4] McCandless Dep. Tr. at 31:17–32:5; Ex. 11 ("Agr.") at -427, "Ex. A: Product Definitions"; 1/23/25 Hr'g Tr. at 10–11.

[5] McCandless Dep. Tr. at 288:9–13; Hess Dep. Tr. at 80:5–7.

[6] Agr. at -425.

[7] Pagonis Dep. Tr. at 50:21–51:2.

transactions by automatically sending an "API call" to a carrier's pickup API.[8]  LTL Documents allows parties to upload and share documents related to LTL shipments.[9]

MyCarrier and P44 first entered into a services contract in 2017 (the "2017 Agreement").[10]  Under the 2017 Agreement, P44 provided MyCarrier services at a steep discount resulting in a negative gross margin.  P44's willingness to support an early-stage company like MyCarrier was due in part to MyCarrier's unique network of connections, which had the potential to expand P44's network and data feeds into a lucrative but difficult-to-access market.[11]

The 2017 Agreement was set to expire in December 2023.  In July 2023, MyCarrier's CEO Michael Bookout approached P44's CEO Jett McCandless about renewing the agreement.  McCandless stated that the parties needed to find a way to bring the MyCarrier account to a positive gross margin for P44.[12]  McCandless gave Bookout two options: end the contract and "[s]eparate as friends" so that MyCarrier "can build APIs directly" or renew the contract for a five-year term with increased pricing.[13]  During the meeting, Bookout made it "100 percent" clear that he wanted to stay with P44.[14]  And the parties negotiated new terms into the fall of 2023.

---

[8] *Id.* at 47:1–13; Agr. at -427, "Ex. A: Product Definitions."

[9] Agr. at -427, "Ex. A: Product Definitions."

[10] Ex. 58 ¶ 14.

[11] McCandless Dep. Tr. at 90:9–11, 164:4–22, 252:20–253:2, 253:13–15, 284:6–13.

[12] Ex. 7 at -247; McCandless Dep. Tr. at 90:4–11.

[13] Ex. 7 at -247.

[14] Bookout Dep. Tr. at 36:3–5.

**B.     The Proxy Project**

Bookout's representation that he "100 percent" wanted to stay with P44 was an overstatement.  In fact, at the time he made that statement, MyCarrier was actively looking for ways to replace P44, including by building their own "proxy" software.[15]

By July 2023, MyCarrier had begun working on what it called the "LTL Carrier Proxy Project" (the "Proxy Project").[16]  A July 2023 document bearing that title outlined MyCarrier's vision for "[d]eliver[ing] a solution that can be stood up next to P44 and provide an alternative to their rating and booking services."[17]  MyCarrier's "solution" was to "incrementally introduc[e] a proxy system that could eventually replace the P44 system."[18]

Customer complaints with P44's product supplied one of the motivations for the Proxy Project.  According to Bookout, MyCarrier customers were increasingly complaining about P44's electronic bill of lading ("eBOL") functionality.[19]  EBOL is the electronic form of paper bills of lading, which are documents populated with information from a shipper detailing the type, quantity, and destination of the goods being carried.[20]  By automatically generating the information needed to effectuate a

---

[15] Ex. 15 (document titled "LTL Carrier Proxy Project"); Ex. 16 at -083, -085 (showing that MyCarrier was seriously considering not signing the contract with P44).

[16] Ex. 15; 1/23/25 Hr'g Tr. at 15, 29.

[17] Ex. 15 at -013.

[18] *Id.* at -014.

[19] Ex. 73 at -375; Ex. 31 at -090; Bookout Dep. Tr. at 72:8–23.

[20] McCandless Dep. Tr. at 182:23–183:12; Barnes Dep. Tr. at 154:2–155:11.

shipment when a shipper books a transaction, eBOL optimizes the shipping process, eliminates the need for paper bills of lading, and reduces costs for LTL carriers.[21] For carriers that use eBOL, LTL Dispatch automatically calls the carriers' eBOL API.[22] In 2022, however, the National Motor Freight Traffic Association ("NMFTA") promulgated new eBOL guidance.[23] Many LTL carriers and other companies—including P44—pledged to conform to these standards by July 2023. P44's eBOL system did not meet the standards by July 2023.[24] (It is unclear whether anyone's did.) Hence the increasing customer complaints.

The increase in price of P44's product supplied another motivation for the Proxy Project. In September 2023, MyCarrier Chief Technology Officer John Hess sent an email to MyCarrier employees with the subject line "P44 Replacement Discussion (9/27/23)."[25] In the email, Hess highlighted concerns with P44's software[26]

---

[21] *See* Barnes Dep. Tr. at 27:1–5, 153:21–154:1, 154:19–155:11.

[22] Pagonis Dep. Tr. at 47:1–13.

[23] McCandless Dep. Tr. at 188:1–189:5.

[24] *See* Ex. 69 at -278 (6/5/23 email stating "P44 can't accept updates to electronic bills of lading . . . "); *id.* at -276 (8/1/23 internal P44 email reflecting that the problem was not yet fixed); Ex. 31 at -087 (2/13/24 internal P44 email explaining the steps that still needed to be made to make P44's eBOL "follow the exact model set by NMFTA"); Ex. 82 (1/31/24 email from McCandless stating "Mycarrier is going direct on eBOL . . . Nmfta driving"); Ex. 85 at -786 (4/15/24 email stating "P44 is in the beginning stages of implementing eBOL per the NMFTA standards").

[25] Ex. 18.

[26] *Id.*

and warned that P44 "wants to increase rates by 23 times with no commitment to improve service[.]"[27]

The initial focus of the Proxy Project was "to deliver features that [MyCarrier] CANNOT deliver through P44[,]" including eBOL.[28] Although that would be the initial focus, the ultimate goal was to replace P44 entirely, as reflected in the subject line: "Replacement Discussion."[29] Hess's September email made clear: MyCarrier intended to "build[] a proxy system to connect to carriers independently of P44."[30]

During this period, MyCarrier hired Andrew Haines, a specialist in building direct APIs and LTL product offerings, to oversee the Proxy Project.[31] Haines understood that one of his goals was to "start executing on [MyCarrier's] eBOL direct to carriers initiative[.]"[32]

Ultimately, Hess told Bookout that MyCarrier did not have time to develop the technology necessary to move away from P44 before the 2017 Agreement expired.[33] So MyCarrier signed a new agreement with P44. Hess testified that MyCarrier's decision to execute a new agreement "reduced the pressure" on him because it bought him more time to build out the Proxy Project.[34]

---

[27] *Id.*

[28] Ex. 22.

[29] Ex. 18.

[30] *Id.*

[31] Ex. 21 at -230; Hess Dep. Tr. at 68:12–69:5.

[32] Ex. 26.

[33] Bookout Dep. Tr. at 102:17–103:3.

[34] Hess Dep. Tr. at 119:12–22.

### C. The Agreement

MyCarrier and P44 executed the new Master Services Agreement on October 1, 2023 (the "Agreement"). The Agreement provided escalating prices over the course of five years, with MyCarrier benefiting from steeply discounted rates for the first two years and paying market rates for the last three.[35]

The Agreement was not expressly exclusive, but it prohibited MyCarrier from competing with P44 or "building behind," which the parties understood to mean MyCarrier building its own version of P44's software.[36] The relevant provisions are in Sections 4.3 and 4.4 of the Agreement, which are quoted in the legal analysis below. By way of summary, MyCarrier represented in Section 4.3 that it would not "develop, distribute, market, or otherwise make commercially available" a "stand-alone" product or service "substantially similar in functionality" to P44 Services. [37] MyCarrier agreed in Section 4.4 that "excluding the Integrated Product, [MyCarrier] shall not market or sell stand-alone Intranet or web-based services that compete with the Services."[38]

---

[35] Agr. at -425; *see also* Bookout Dep. Tr. at 43:21–23; Ex. 7 at -254; Pagonis Dep. Tr. at 250:22–253:15.

[36] Bookout Dep. Tr. at 26:8–25 (defining "build behind" as meaning that MyCarrier would "go build something that [P44] had built – to go do it ourselves"); *see also* Barnes Dep. Tr. at 49:5–18 (defining the related concept of "disintermediation" and confirming that "that's what Mr. Scheid wanted to do as it related to P44").

[37] Agr. at -437 § 4.3.

[38] *Id.* at -437 § 4.4.

The restrictions of Sections 4.3 and 4.4 were important to P44, as McCandless stated in negotiations.[39] Bookout understood that these restrictions were important to P44, and told McCandless "direct to his face, that I don't want to build behind you. I do not want to replace you."[40] Bookout knew that one of the "[k]ey terms" MyCarrier's legal team was looking at included the "[n]on-[c]ompete."[41]

MyCarrier negotiated for the right to establish "incremental connectivity" with its customers. MyCarrier also proposed the "stand-alone" qualifier. MyCarrier expressed to P44 that its basis for implementing this language was that there were times MyCarrier "may need to go directly with [their] customers[.]"[42] The carve-out is found in Section 4.3. It provides that "there are no restrictions on Reseller's rights to integrate directly with any of its Clients' systems including, but not limited to, ERP, CRM, WMS, Pricing/Rating Engines, or other related systems which may be required to manage and/or support the Resellers TMS platform."[43]

When proposing edits that became this text, MyCarrier represented that the changes were not intended to diminish the non-compete requirements of Section 4.3. In an August 9, 2023 email from Bookout to McCandless transmitting a redline of the Agreement, Bookout stated that he "[a]dded considerations around incremental

---

[39] Bookout Dep. Tr. at 26:14–25; McCandless Dep. Tr. at 120:2–18.

[40] Bookout Dep. Tr. at 26:8–13; *see also id.* at 41:4–14.

[41] Ex. 76 at -743.

[42] Bookout Dep. Tr. at 67:20–24; *see also* Ex. 8 at -436; Ex. 13 at -538.

[43] Agr. at -437 § 4.3.

connectivity MyCarrier may need to do directly with our customers while maintaining non-compete considerations with P44."[44]

Contemporaneous evidence and the testimony of other witnesses corroborate that MyCarrier understood the nature of this commitment. MyCarrier's Vice President of Finance Taylor Mitchell added a comment to a draft of the Agreement stating that MyCarrier did not want to "compete with P44 nor ha[d] any intention to" and that P44 "should not misconstrue any direct carrier connections as competition of our integrated product."[45] At one point in the negotiation, MyCarrier's outside counsel at Goodwin Proctor let it slip that that MyCarrier's proposed carve-out was intended to allow MyCarrier "to go to customers and replace P44 customers."[46] In response to this slip-up, Mitchell "clarified" that MyCarrier did not intend to compete with P44 and only sought to create carrier connections that would "never make[] sense for P44" to build.[47] P44 accepted these assurances as true and entered into the Agreement.[48]

### D. The Proxy Project Reveal

Bookout and McCandless met for dinner on January 31, 2024. At the end of dinner, while waiting for the valet,[49] Bookout informed McCandless that MyCarrier

---

[44] Ex. 9 at -249.

[45] Ex. 13 at -544.

[46] Ex. 10 at -462.

[47] *Id.*; *see also* McCandless Dep. Tr. at 145:20–146:12.

[48] McCandless Dep. Tr. at 297:9–298:10, 298:15–24.

[49] Bookout Dep. Tr. at 79:11–13.

9

was developing its own eBOL functionality.[50] Bookout told McCandless this was due to customer complaints.[51] McCandless immediately informed Bookout of his view that MyCarrier's development of eBOL was the sort of "build behind" prohibited under the Agreement.[52]

P44 offered eBOL functionality as part of its services, and MyCarrier was a heavy user of that function.[53] But the functionality had issues. Once McCandless understood the customer concerns, P44 moved quickly to "fully develop and migrate to a new NMFTA-compliant eBOL." [54] P44 estimated that this would take approximately two to three months.[55]

Throughout February, McCandless communicated P44's position and the planned eBOL improvements to Bookout. He restated his position that "building eBOL would be in conflict with our deal."[56]

MyCarrier nevertheless carried on developing its own eBOL functionality. In February 2024, Bookout reached out to an LTL carrier to "discuss EBOL" so that they could be "one of [MyCarrier's] first direct connectors (no P44)[.]"[57] In April 2024,

---

[50] *Id.* at 77:3–13.

[51] Ex. 31 at -090; Bookout Dep. Tr. at 77:3–13.

[52] Bookout Dep. Tr. at 79:5–9.

[53] McCandless Dep. Tr. at 306:6–11; Pagonis Dep. Tr. at 243:6–15, 244:24–245:3; Ex. 30.

[54] Ex. 31 at -088.

[55] *Id.*

[56] Ex. 30.

[57] Ex. 29.

Haines reached out to nine LTL carriers directly "to initiate a conversation regarding whether [each LTL carrier] has developed an eBOL (NMFTA standard) API service" and asked about the integration steps.[58] One of the carriers asked MyCarrier if it was "aware that Project44 is also implementing the standardized eBOL" and whether that would "make a difference in [MyCarrier's] direction to directly connect[.]"[59] Haines replied: "No, this would not make a difference in our direction to directly connect."[60]

As of February 2024, Hess estimated that the Proxy Project was "18 months out."[61] In March 2024, one of MyCarrier's lead engineering architects estimated that the P44 proxy would be ready in "one sprint," or two weeks.[62] The same month, MyCarrier board member Tracy Black reached out to Hess to ask about MyCarrier's work "to do some more direct api connections to replace P44."[63] Hess responded that they "will begin the requirements phase in June" "[f]or the P44 project[.]"[64]

MyCarrier's internal documents further confirm this timeline. A document titled "Tech Spec: P44 proxy," created May 15, 2024,[65] "outlines the implementation

---

[58] Ex. 32 at -1499, -1501, -1502, -1657, -1658, -1724, -1733, -2670, -2860–61.

[59] Ex. 33 at -391–392.

[60] *Id.* at -391.

[61] Ex. 38; Hess Dep. Tr. at 77:9–23.

[62] Ex. 40 at -365; Pagonis Dep. Tr. at 124:11.

[63] Ex. 57.

[64] *Id.*

[65] P44 Opening Br. at 28.

of a P44 proxy with explicit migration stages."[66] Stage One of this plan consisted of "[c]reat[ing] a proxy layer between services and P44 to take control over existing contracts."[67] This stage also provided that "[c]ontrollers should mimic the existing P44 API structure [it was] using."[68] Stage Two consisted of MyCarrier "[c]reat[ing] its] own SDK" and "[r]eplac[ing] P44 SDK with [MyCarrier's] in the monolith and other services[.]"[69] Stage Three required "[m]oving forward carrier onboarding[.]"[70]

### E. This Litigation

By June 2024, MyCarrier was nearly ready to launch its eBOL functionality with two carriers and had two more lined up to follow.[71] On June 18, 2024, P44 sent MyCarrier a letter demanding that MyCarrier immediately cease and desist the development of its eBOL technology because it was substantially similar to P44's eBOL technology and therefore violated the Agreement.[72]

MyCarrier agreed to suspend development of its eBOL software on June 20, 2024.[73] Over the next few days, the parties entered into a non-disclosure agreement

---

[66] Ex. 41 at -082.

[67] *Id.*

[68] *Id.* at -083.

[69] *Id.*

[70] *Id.* at -084.

[71] Ex. 24 at -895.

[72] Ex. 42.

[73] Ex. 43 ¶ 4.

and engaged in Rule 408 discussions.[74] At some point during those discussions, MyCarrier became fearful that P44 was going to suspend all services.

The Agreement contains an arbitration provision, but it does not require arbitration of claims for injunctive relief.[75] On July 1, 2024, MyCarrier filed this action for breach of the Agreement seeking injunctive relief.[76] MyCarrier also moved to temporarily restrain P44 from suspending services (the "TRO") and to expedite proceedings.[77] On July 11, 2024, P44 filed an Answer and Counterclaims for fraud and breach of the Agreement.[78] The crux of P44's Counterclaims concerned MyCarrier's efforts to build eBOL functionality. P44 also moved to expedite the Counterclaims.[79] Meanwhile, MyCarrier demanded arbitration.

The court held argument on the TRO and cross-motions to expedite on July 17, 2024.[80] During the hearing, P44 denied any intent to suspend services and MyCarrier stated that it had ceased work on its eBOL product.[81] The court granted the motion to expedite but denied the TRO given the parties' representations. The court ordered the parties to provide five business days' notice before P44 terminated

---

[74] *Id.* ¶¶ 6–7.

[75] Agr. at -439–40 § 11.

[76] Dkt. 1.

[77] Dkts. 3–7.

[78] Dkt. 26 ("Counterclaims").

[79] Dkt. 24.

[80] Dkt. 50.

[81] Dkt. 40 at 6, 12, 14.

services or MyCarrier resumed work on its eBOL development.[82] The court also ordered MyCarrier to produce documents concerning its eBOL development, which MyCarrier completed by July 24, 2024.[83] The court later expedited proceedings on P44's motion to preliminarily enjoin MyCarrier from developing its eBOL program.[84]

### F. MyCarrier Moves To A Different Supplier.

Meanwhile, MyCarrier changed strategies. Rather than develop its own eBOL service, it decided to switch suppliers. On September 23, 2024, MyCarrier informed P44 that it would be "connecting to its shipping carriers through a different conduit supplier."[85] That supplier was SMC3, which MyCarrier co-founder Chris Scheid had first contacted months prior.[86] SMC3 describes itself as "the leading [LTL] and truckload data and solutions provider" that "optimiz[es] freight transportation across the supply chain."[87] One of the MyCarrier board members is also a board member at SMC3.[88]

By July 2024, MyCarrier and SMC3 were marking up a draft Master Services Agreement ("SMC3 Agreement").[89] The parties negotiated over risk associated with this litigation. On July 16, 2024, MyCarrier proposed a revision stating that "SMC3

---

[82] *Id.* at 34.

[83] *Id.* at 34–35.

[84] Dkt. 56.

[85] *Id.*

[86] Ex. 46 at -249.

[87] About SMC3, https://www.smc3.com/about.htm (last visited February 28, 2025).

[88] Bookout Dep. Tr. at 83:2–21.

[89] Ex. 47.

acknowledges that [MyCarrier] has an existing contractual agreement in place with project44, Inc. . . . pursuant to which P44 provides [MyCarrier] with access to technology that may be similar to the SMC3 Systems and services."[90] The mark-up reflected the possibility that the SMC3 Agreement may be "determined by a ruling of a court or arbitration tribunal to be unlawful or violate any third party's rights."[91] A version of the SMC3 Agreement also contemplated that MyCarrier would indemnify SMC3 against any claims arising from this litigation.[92]

Just over a week after MyCarrier informed P44 of the move to SMC3, on October 4, 2024, MyCarrier gave P44 five days' notice that it would "resume eBOL work, but only such work as is not stand-alone and is not sold in competition with P44's products or services."[93]

P44 took the position that selling services in partnership with SMC3 violated Section 4.4 of the Agreement, which prevented MyCarrier from marketing or selling stand-alone products that compete with the Services P44 provided under the Agreement. P44 moved for a TRO to enjoin MyCarrier from using SMC3's services.[94] P44 also raised its prior arguments that MyCarrier's eBOL development breached the anti-"build behind" restrictions of the Agreement.

---

[90] *Id.* at -427 § 5.4.

[91] *Id.* at -426 § 4.4.

[92] Ex. 48 at -730 § 12.3.

[93] Ex. 49.

[94] Dkt. 66.

The court granted the TRO in part on October 16, 2024, temporarily restraining MyCarrier from resuming eBOL development but allowing MyCarrier to engage with SMC3. The court cautioned MyCarrier that "[t]here's a risk there to MyCarrier" that "moving forward with" SMC3 could "ultimately be determined to violate the [A]greement."[95]

## II.   LEGAL ANALYSIS

"To obtain a preliminary injunction, a plaintiff must demonstrate: (i) a reasonable probability of success on the merits; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction."[96] This analysis focuses on P44's contract claims, largely because it is difficult to conceive of preliminary injunctive relief tied to a successful claim of fraud, and P44 did not attempt in briefing to make this connection.[97] P44 has demonstrated that it is likely to succeed on its contract claims, but has failed to establish a likelihood of irreparable harm. Because P44's motion fails on the second essential element for a preliminary injunction, this analysis does not balance the equities.

---

[95] Dkt. 84 at 38.

[96] *Mountain W. Series of Lockton Cos. v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *9 (Del. Ch. June 20, 2019); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004) (weighing likelihood of success "even more heavily" where the "merits determination is, for all practical purposes, akin to a final ruling").

[97] *See* P44 Opening Br. at 45–50 (arguing irreparable harm based on contractual breach).

## A. Likelihood Of Success

To prevail on a claim for breach of contract, a party must demonstrate the existence of a contract, the breach of an obligation imposed by that contract, and harm or damage resulting from the breach.[98]

The parties do not dispute the existence of the Agreement. They dispute whether MyCarrier breached the Agreement. P44 claims that MyCarrier breached the Agreement in two ways: by developing a standalone eBOL and by moving to SMC3. MyCarrier denies that either activity violated the Agreement. MyCarrier further argues that no harm or damage resulted from any breach. This decision addresses the element of harm when analyzing whether P44 established a threat of irreparable harm.

The proper interpretation of language in a contract is a question of law.[99] The courts interpret clear and unambiguous language using its ordinary and usual meaning.[100] Absent some ambiguity, Delaware courts will not destroy or twist language under the guise of construing it.[101] When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning.[102] When there is uncertainty in the meaning and application of contract language, the reviewing court

---

[98] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[99] *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991).

[100] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (citing *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992)).

[101] *Id.*

[102] *Id.*

may consider extrinsic evidence to arrive at a proper interpretation of contractual terms.[103]

A contract is not rendered ambiguous because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.[104] Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."[105]

### 1. Developing EBOL

P44 claims that MyCarrier breached Section 4.3 of the Agreement by developing a stand-alone eBOL product.[106] Section 4.3 of the Agreement provides:

> During the Term of this Agreement, Reseller agrees that it shall not develop, distribute, market or otherwise make commercially available a stand-alone (i) product, (ii) service, or (iii) application programming interface(s) ("APIs"), or other data delivery modes, which are substantially similar in functionality or identical in functionality to the Services or the APIs or other data delivery modes developed by P44 to provide the Services, the Sourced Data, and the Integrated Product. Nothing herein shall restrict Reseller from developing, distributing, marketing or otherwise making commercially available a product or offering which, among other things, includes or

---

[103] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[104] *Rhone-Poulenc*, 616 A.2d at 1196 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

[105] *Id.* (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983)).

[106] P44 Opening Br. at 13–14, 39, 41–44.

incorporates the Services under the terms of this Agreement. For the avoidance of doubt, there are no restrictions on Reseller's rights to integrate directly with any of its Clients' systems including, but not limited to, ERP, CRM, WMS, Pricing/Rating Engines, or other related systems which may be required to manage and/or support the Resellers TMS platform.[107]

Excising the relevant text, Section 4.3 prohibits MyCarrier from developing a "stand-alone" service that is "substantially similar in functionality" to the "Services." The parties dispute three issues: whether eBOL fell within the definition of "Services"; whether MyCarrier's eBOL was "substantially similar in functionality" to that of P44; and whether MyCarrier's eBOL was a "stand-alone" service. P44 is likely to prevail on the merits of each of these issues.

First, the definition of "Services" includes P44's eBOL. The Agreement defines "Services" to include access to P44's Freight API Platform.[108] The Freight API Platform includes P44's LTL Dispatch.[109] The LTL Dispatch provides eBOL functionality for carriers.[110] Accordingly, the Services include eBOL.

MyCarrier argues that eBOLs were not part of the Services based on a redlined version of the Agreement, which includes a margin comment from Mitchell stating:

---

[107] Agr. at -437 § 4.3.

[108] *Id.* at -433, Ex. A (defining "Services" as follows: "(i) access to P44's Freight API Platform and (ii) any data, information and input that may be obtained and collected by means of use of devices, applications, and the like, from third parties (including, but not limited to, telematics/ELD providers, carriers, and transport providers) ("Sourced Data"), which data's provision to P44 is a prerequisite for the delivery of Services based on Sourced Data ((i) and (ii) collectively, the "Services")").

[109] Pagonis Dep. Tr. at 19:5–12, 47:1–13, 50:10–51:16.

[110] *Id.*; Agr. at -427, "Ex. A: Product Definitions."

"No eBOL."[111]  Specifically, in a margin comment on Section 1 of the P44 Order Form, titled "Renewal or Order Form," P44 wrote: "It is P44's understanding that this was a request by MyCarrier - can you please confirm that you do not need eBOL as part of the Services?"  MyCarrier then commented "No Ebol."[112]  It is far from clear, however, what this margin conversation on the "Renewal or Order Form" section meant.  As outlined above, the plain language of the main portions of the Agreement reflect that Services include eBOL.  And if the court were to consider extrinsic evidence, the balance of the record reflects that eBOL was a part of the "Services."[113]

Second, MyCarrier's eBOL was substantially similar in functionality to P44's. This is confirmed by the fact that it was offered to LTL carriers as a replacement for P44's eBOL functionality.  When MyCarrier was preparing for the imminent launch of its direct eBOL with carrier Estes on June 19, a representative from Estes told Haines "BOLs are looking good . . . we are ready to start receiving them directly next Thursday 6/27 from MyCarrier as opposed to P44 . . . . If issues arise . . . can you make the connection back to P44 quickly?"[114]  Haines confirmed that "[i]f issues arise, we can revert back to the current P44 process."[115]  Similarly, Barnes testified that he

---

[111] MyCarrier Ans. Br. at 32 (citing Ex. 81 at -929, Ex. 81.1).

[112] Exs. 81, 81.1 at -929.

[113] Pagonis Dep. Tr. at 243:6–15, 244:24–245:3; McCandless Dep. Tr. at 306:6–11; Bookout Dep. Tr. at 78:17–22, 157:17–24; Ex. 30.

[114] Ex. 52 at -637.

[115] *Id.* at -636.

understood MyCarrier's eBOL development "was the same thing [as P44's] but going to be controlled and built by MyCarrier."[116]

Third, MyCarrier's eBOL was a "stand-alone" product. MyCarrier argues that "stand-alone" did not necessarily mean "stand-alone from P44's products" because those particular words "are nowhere in the Agreement."[117] Merriam-Webster defines "standalone" as "complete in itself" or "intended, designed, or able to be used or to function alone or separately."[118] The record demonstrates that MyCarrier's eBOL development was intended to function alone or separately from the Services contracted for in the Agreement. That is, MyCarrier wanted to remove P44 from the equation entirely.[119] This is reinforced by MyCarrier's project title of "LTL Carrier Proxy Project."[120] Merriam-Webster defines "proxy" as "the agency, function, or office of a deputy who acts as a substitute for another."[121] The Agreement did not allow MyCarrier to "substitute" P44's functionality—but that is exactly what it was doing.

MyCarrier contends that "P44 suggests that 'stand-alone' has some technical software engineering meaning, referring to computer code that is separated from

---

[116] Barnes Dep. Tr. at 29:12–14.

[117] MyCarrier Ans. Br. at 30.

[118] Standalone Definition & Meaning, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/standalone (last visited February 28, 2025).

[119] Barnes Dep. Tr. at 19:14–20:1; Ex. 15 at -013–14; Ex. 40 at -365; Ex. 52 at -636–37; Ex. 57.

[120] Ex. 15.

[121] Proxy Definition & Meaning, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/proxy (last visited February 28, 2025).

other programming."[122]  Perhaps that is true.  But the point was not developed in the record.  The record reflects that P44's expert—who reviewed source code at MyCarrier's facilities, including their eBOL repository and "all repositories that interface with P44"—found that the MyCarrier eBOL software operates "through a standalone API and was developed in a separate repository from the software [he] examined that interfaced with P44[.]"[123]  This analysis is consistent with the language as drafted in the Agreement, as well as the plain meaning of "stand-alone."

MyCarrier also addresses competition with P44 generally, stating that MyCarrier's eBOL functionality "was not a competitive threat to P44"[124] and that "MyCarrier's web-based service customizing the shipping experience does not compete with P44's software 'pipe' for data transmission."[125]  But the Agreement does not prevent MyCarrier's development of services that compete with P44 as a company; it prevents MyCarrier's development of services that compete with the Services governed by the Agreement, including P44's eBOL functionality.

MyCarrier seems to argue that it complied with its contractual obligations because P44's products did not meet carrier needs or industry standards.  Specifically, MyCarrier argues that P44 "did not have a working, NMFTA-compliant eBOL product" so MyCarrier was therefore permitted "to fill the 'gaps' in P44's products" as

---

[122] MyCarrier Ans. Br. at 30–31.

[123] Ex. 1 ¶¶ 25, 34.

[124] MyCarrier Ans. Br. at 2.

[125] *Id*. at 17.

they "did not implicate Section 4.3."[126] But Section 4.3 does not permit MyCarrier to independently develop products that compete with the Services if MyCarrier unilaterally determined that the Services were inferior to its customers' needs. Even assuming Section 4.3 operated as MyCarrier suggests, the record does not reflect that MyCarrier brought its concerns about eBOL to P44's attention in any meaningful way. Almost immediately after Bookout informed McCandless that MyCarrier was developing its own eBOL functionality, McCandless reached out to his team to get more information on the deficiencies Bookout mentioned.[127] Less than two weeks later, P44 appeared to have a plan in place to "fully develop and migrate to a new NMFTA-compliant eBOL."[128] MyCarrier's inaction related to its complaint that P44's products did not meet carrier needs or industry standards does not permit its eBOL development in violation of the Agreement.

For all these reasons, P44 has demonstrated that it is likely to prevail on the merits of its claim that MyCarrier's eBOL development violates Section 4.3.

### 2. Moving To SMC3

P44 claims that MyCarrier breached Section 4.3 of the Agreement by transitioning to SMC3, through which MyCarrier continues to offer the same services it used to provide through P44's API system. According to P44, MyCarrier has violated Section 4.3 by "making commercially available" products with "substantially

---

[126] *Id.* at 33.

[127] Ex. 31 at -090.

[128] *Id.* at -088.

similar functionality" as those developed by P44 to provide the Services (*i.e.*, LTL Visibility, LTL Dispatch, LTL Rating, and LTL Documents).[129]

P44 also claims that MyCarrier breached Section 4.4 by transitioning to SMC3.[130] Section 4.4 provides:

> During the Term of [the] Agreement, and excluding the Integrated Product, [MyCarrier] shall not market or sell stand-alone Intranet or web-based services that compete with the Services.[131]

MyCarrier's conduct in offering rating, dispatch, visibility, and document services in the LTL market through SMC3 violates both provisions. The record confirms that MyCarrier started using SMC3 for the same services P44 previously provided under the Agreement.[132] Therefore, these products have "substantially similar functionality." MyCarrier's contract with SMC3 confirms as much.[133] Furthermore, MyCarrier is making them "commercially available" given that it is flowing data through SMC3's platform to its customers.[134] This conduct violates Section 4.3.

---

[129] P44 Opening Br. at 44.

[130] *Id.* at 45.

[131] Agr. at -437 § 4.4.

[132] Hess Dep. Tr. at 91:10–23, 114:24–115:7; Scheid Dep. Tr. at 146:14–22, 148:2–7; Ex. 45 (MyCarrier informing P44 that due to P44 being "uninterested in discharging its obligation to MyCarrier[,]" MyCarrier is "forced . . . to identify alternatives to protect its business and its customers' interests" including by "connecting to its shipping carriers through a different conduit supplier").

[133] Ex. 47 at -427 § 5.4 ("P44 provides [MyCarrier] with access to technology that may be similar to the SMC3 Systems and services[.]").

[134] Scheid Dep. Tr. at 147:5–20, 148:2–7.

With respect to Section 4.4, the services SMC3 now provides to MyCarrier are "stand-alone" services because they are "complete in itself" or "intended, designed, or able to be used or to function alone or separately." MyCarrier has ceased using P44 altogether for the same services.[135] And SMC3 competes with P44; MyCarrier knew as much.[136] Last, MyCarrier is "marketing or selling" these services by using SMC3 as a conduit to connect MyCarrier to its customers.[137] Thus, P44 is likely to prevail on the claim that MyCarrier has violated Section 4.4 by transitioning to a P44 competitor for the same services covered by the Agreement.

In response to P44's arguments concerning MyCarrier's transition to SMC3, MyCarrier relies on comments made by P44's counsel at prior hearings in this action that purportedly "affirm[] . . . that MyCarrier may work with alternative providers."[138] But MyCarrier mischaracterizes the record. During the July 17, 2024 hearing, P44 raised potential actions that MyCarrier could take in the context of arguing that MyCarrier would not suffer irreparable harm absent injunctive relief against its eBOL development.[139] P44's counsel did not affirmatively state that those options would not violate the Agreement. During the October 16, 2024 hearing, P44

---

[135] *Id.* at 148:2–4; Haines Dep. Tr. at 151:6–23 (testifying that MyCarrier's business would "stop today" if SMC3 "were to go down").

[136] Bookout Dep. Tr. at 85:14–17.

[137] Scheid Dep. Tr. at 147:5–20 (testifying that MyCarrier "flow[s] data through SMC3" to carriers), 148:2–7 (confirming that MyCarrier is "executing the business it used to execute through project44 now on SMC3").

[138] MyCarrier Ans. Br. at 36–37.

[139] Dkt. 40 at 16–17.

took issue with MyCarrier's conduct and suggested that "they could have reached out" in advance of finding an alternative service provider.[140] Again, P44 does not take the position that this conduct would not have violated the Agreement. And MyCarrier fails to acknowledge that it followed its announcement to P44 of the SMC3 transition, less than two weeks later, with an announcement that it was resuming its eBOL development.[141] None of this changes that MyCarrier's conduct in transitioning away from P44 to an alternative service provider violated Sections 4.3 and 4.4 of the Agreement.

MyCarrier also argues that there is no exclusivity covenant in the Agreement,[142] but this argument ignores the plain language of Section 4.3, as discussed above. Nor does Section 2.11 excuse MyCarrier's conduct, as this provision allows "other services operated or provided by [MyCarrier] or third parties" to "interoperate on or with" the Services as long as they "**do not** include any third party APIs or other services that are incorporated into the Services by P44."[143] This provision does not permit the replacement of P44 with another service provider; it permits the "incremental connectivity" for which MyCarrier negotiated.

The "Integrated Product" exclusion also does not permit MyCarrier's transition to SMC3. The Agreement defines "Integrated Product" as a "product or service which

---

[140] Dkt. 84 at 35–36.

[141] Ex. 49.

[142] MyCarrier Ans. Br. at 37.

[143] Agr. at -436 § 2.11 (emphasis in original).

includes the Services and other products, services, features and/or functionality which consist of material additional or different features and functionality beyond those included in the Services." [144]   As the definition of "Reseller Product" demonstrates, MyCarrier's product "when combined with the Services" P44 provides under the Agreement constitutes an Integrated Product.[145]  Thus, the exclusion is intended to allow MyCarrier to market and sell to third parties its product as deployed in P44's pipeline of API connections.  This exclusion does not permit MyCarrier to transition to an alternative provider such as SMC3 for the same services P44 used to provide and cease using P44 altogether.

## B.   Irreparable Harm

Harm is irreparable unless "alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."[146]  The "loss of control of reputation, loss of trade, and loss of goodwill" constitute irreparable injury.[147]  Because a preliminary injunction is an extraordinary form of equitable relief, it should not be granted if the injury to the moving party is merely speculative.[148]  Although the difficulty in calculating damages

---

[144] *Id.* at -433.

[145] *Id.*

[146] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011) (quoting *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000)).

[147] *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)).

[148] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *5 (Del. Ch. Nov. 5, 2004).

may constitute irreparable harm,[149] "[m]ere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."[150]

As best understood, P44 advances four arguments for irreparable harm. First, P44 argues that MyCarrier's development of direct standalone API connections and transition to a competitor is "classic disintermediation."[151] Second, P44 argues that MyCarrier's transition to SMC3 has caused irreparable harm by damaging P44's reputation in the LTL market.[152] Third, P44 argues that MyCarrier's actions have shrunk the breadth of P44's network in the LTL market and eliminated a unique data source for P44.[153] Fourth, P44 argues that MyCarrier improperly continues to use data it received under its Agreement with P44.[154]

P44's first argument, relying on disintermediation, does not present a likelihood of irreparable harm. In essence, disintermediation means that MyCarrier's customers would bypass P44 entirely and go directly to MyCarrier for the services P44 previously provided.[155] P44 is paid for its service connecting shippers and carriers—that is the essence of the Agreement. As MyCarrier notes, P44's concern can be boiled down to a future harm in the form of lost revenue, for

---

[149] *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000).

[150] *Alpha Builders*, 2004 WL 2694917 at *5.

[151] P44 Opening Br. at 45–47.

[152] *Id.* at 48.

[153] *Id.*

[154] *Id.* at 48–50.

[155] Ex. 15; Ex. 41; McCandless Dep. Tr. at 253:18–21, 273:1–17; Barnes Dep. Tr. at 49:5–18; Ex. 98 ¶ 20.

28

which a remedy at law is adequate. This future harm would not pose an existential crisis to P44.[156] MyCarrier accounts for a few hundred thousand dollars of the $10 million in revenue that P44 brings in from LTL products.[157] In 2023, P44's total revenue was over $125 million.[158] Even if P44 showed that the approximate $10 million in revenue it derives from the LTL market were in jeopardy, a potential threat to eight percent[159] of its total revenue does not amount to irreparable harm.

P44 does not cite a case standing for the proposition that disintermediation constitutes irreparable harm. P44 relies on *Tristate Courier and Carriage, Inc. v. Berryman*, in which the court held that a former employee breached a noncompete provision in a stock purchase agreement with its former employer by specifically targeting and pursuing clients of its former employer for substantially similar services.[160] The court enjoined the former employee from taking further actions breaching the agreement and held that the loss of client goodwill constituted irreparable harm, particularly in the context of a contract for the sale of stock, which

---

[156] Ramachandran Dep. Tr. at 65:8–16, 132:9–21, 143:11–21; Pagonis Dep. Tr. at 198:9–199:6.

[157] McCandless Dep. Tr. at 253:3–17, 286:19–23; Agr. at -425 (noting the 2024 subscription fee for MyCarrier under the Agreement was $333,000).

[158] McCandless Dep. Tr. at 26:18–19.

[159] MyCarrier asserts that it comprises a mere 0.27% of P44's revenues but does not cite to anything in the record as support. MyCarrier Ans. Br. at 55.

[160] 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

involves a "less searching" inquiry than if the covenant had been in an employment contract.[161]

P44 also relies on *Cabela's LLC v. Wellman*, [162] and *Horizon Personal Communications, Inc. v. Sprint Corporation*[163] in support of the argument that courts "often assume irreparable harm in the trademark and unfair competition context."[164] But the parties in both cases had stipulated to irreparable harm in the contracts at issue. The court's inquiry in *Cabela's* ended with the plain language of the contract.

The court in *Horizon* analyzed the common law factors concerning irreparable harm in addition to considering the parties' stipulation. There, the plaintiffs were in an affiliate program with pre-merger Sprint in which customers could not distinguish between portions of the network operated by the affiliates and those operated by Sprint.[165] Following Sprint's merger with Nextel, the court held that "the possibility of trademark confusion stemming from Plaintiffs and Sprint Nextel's use of the identical brand and marks in the Service Areas for different and directly competing products and services leads to the inescapable conclusion that irreparable injury

---

[161] *Id.*

[162] 2018 WL 5309954 (Del. Ch. Oct. 26, 2018).

[163] 2006 WL 2337592 (Del. Ch. Aug. 4, 2006).

[164] P44 Opening Br. at 47. In its opening brief, P44 incorrectly attributes this and other language quoted in *Horizon* to *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016). The court does not address *Medicalgorithmics* because it did not involve an irreparable harm analysis.

[165] *Horizon*, 2006 WL 2337592 at *2.

w[ould] result."[166]   No one has raised trademark confusion here.   *Horizon* is inapposite.

P44's second argument concerning reputational damage also fails.  The only evidence P44 cites in support of this argument is its CEO's statement, without explanation, that violation of the no-"build behind" provision "would impact . . . [P44's] brand reputation[.]"[167]  There is no other support in the record,[168] and this sole statement is too little to go on.

P44's third argument that MyCarrier's actions eliminated a stream of unique data also fails.  The numbers do not support this argument.  P44 contracted with other operators in the LTL market;[169] MyCarrier's data accounted for approximately 12 to 15 percent of the overall LTL data inputted into P44's models.[170]  And the LTL market accounts for approximately 15 to 20 percent of P44's budget to develop its product lines.[171]

---

[166] *Id.* at \*24; *see also id.* (further holding that "Sprint Nextel's planned actions contravene[d] certain fundamental principles of trademark law and contemplate[d] use of the Sprint brand and marks in a way likely to harm Plaintiffs' business" and that "Plaintiffs will suffer irreparable harm if, in Plaintiffs' Service Areas, Sprint Nextel offers [certain] products and services using the same brand and marks as Plaintiffs").

[167] P44 Opening Br. at 47 (citing McCandless Dep. Tr. at 252:20–253:2).

[168] *See, e.g.*, Pagonis Dep. Tr. at 205:15–206:21 (testifying that no one at P44 has attempted to measure or quantify the effect on P44's model of losing MyCarrier's data).

[169] *Id.* at 208:6–10.

[170] *Id.* at 204:18–205:1.

[171] Ramachandran Dep. Tr. at 27:4–14.

The witness testimony does not support this argument. P44's CTO testified that P44 only retains this data for three to six months,[172] and that P44 does not use the retained data other than with respect to the specific customer.[173]

The Agreement undermines this argument. "Sourced Data" and "Data" are defined terms in the Agreement. The Agreement defines "Data" as MyCarrier's and its customers' transportation management system data.[174] Under the Agreement, P44 does not provide any "Data"—it provides the platform for the Data to flow through. The Agreement defines "Sourced Data" as "any data, information and input that may be obtained and collected by means of use of devices, applications, and the like, from third parties (including, but not limited to, telematics/ELD providers, carriers, and transport providers)."[175] "Sourced Data" thus might be of use to P44, but the Agreement provides that Sourced Data is a "prerequisite for the delivery of Services."[176] Section 5.2 of the Agreement provides that P44 is entitled to the Data "as necessary to provide the Services" and that MyCarrier "reserves all rights, title and interest in and to the Data."[177] The Agreement further states that P44's license

[172] *Id.* at 60:18–61:10.

[173] *Id.* at 62:1–63:7.

[174] Agr. at -433, -437.

[175] *Id.* at -433.

[176] *Id.*

[177] *Id.* at -437 § 5.2.

to "use and exploit data collected from [MyCarrier]" is only "in connection with providing and improving the Services[.]"[178]

Putting it all together, the Agreement allows and restricts P44's access to Sourced Data for the purpose of providing the Services. P44 has no independent right to that data source.

The fourth argument concerning MyCarrier's continued use of the data fails as well. Under the Agreement, MyCarrier "reserve[d] all rights" to do so.[179]

P44's four arguments that it will suffer irreparable harm fail.

## III.  CONCLUSION

Because P44 has not demonstrated that it will suffer an irreparable injury, P44's motion for a preliminary injunction is denied.

---

[178] *Id.*

[179] *Id.*